## FOREMOST INSURANCE CO. ET AL. *v.* RICHARDSON ET AL.

No. 80–2134.   Argued January 12, 1982—Decided June 23, 1982

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined.   POWELL, J., filed a dis-

senting opinion, in which BURGER, C. J., and REHNQUIST and O'CON-
NOR, JJ., joined, *post*, p. 677.

*Arthur H. Andrews* argued the cause and filed a brief for
petitioners.
*Dorsey C. Martin III* argued the cause and filed a brief for
respondents.

JUSTICE MARSHALL delivered the opinion of the Court.

The issue presented in this case is whether the collision of
two pleasure boats on navigable waters falls within the admi-
ralty jurisdiction of the federal courts. See 28 U. S. C.
§ 1333. We granted certiorari to resolve the confusion in the
lower courts respecting the impact of *Executive Jet Aviation,
Inc.* v. *City of Cleveland,* 409 U. S. 249 (1972), on traditional
rules for determining federal admiralty jurisdiction. 454
U. S. 813 (1981). The United States Court of Appeals for
the Fifth Circuit held that an accident between two vessels in
navigable waters bears a sufficient relationship to traditional
maritime activity to fall within federal admiralty jurisdiction.
We affirm.

I

Two pleasure boats collided on the Amite River in Louisi-
ana, resulting in the death of Clyde Richardson. The wife
and children of the decedent brought this action in the United
States District Court for the Middle District of Louisiana, al-
leging, *inter alia*, that petitioner Shirley Eliser had negli-
gently operated the boat that collided with the vessel occu-
pied by the decedent.[1] Respondents also named petitioner

---

[1] The wife and children of the decedent also named respondent June
Allen as a defendant. They alleged that Allen was operating the vessel at
the time of the collision, and that the decedent's death was caused by either
the negligence of Allen or that of petitioner Eliser. Allen counter-
claimed, alleging that the decedent had been operating the boat, and that
her injuries were caused by his negligence. The factual dispute concern-

Foremost Insurance Co., Eliser's insurer, as a defendant. Jurisdiction was claimed under 28 U. S. C. § 1333(1), which gives federal district courts exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." Petitioners moved to dismiss, arguing that the complaint did not state a cause of action within the admiralty or maritime jurisdiction of the District Court.

In ruling on petitioners' motion, the District Court found the following facts to be undisputed:[2]

"(1) One boat was used for pleasure boating, such as boat riding and water skiing, and at the time of the accident the boat was actually pulling a skier on a zip sled;

"(2) The other boat was used exclusively for pleasure fishing and was described as a bass boat;

"(3) Neither boat had ever been used in any 'commercial maritime activity' before the accident;

"(4) At the time of the accident neither boat was involved in any 'commercial maritime activity' of any sort;

"(5) Neither of the two drivers of the boat were being paid to operate the boat nor was this activity in any way a part of their regular type of employment;

"(6) None of the passengers on either boat were engaged

ing whether the decedent or Allen was operating the boat is irrelevant to the jurisdictional issue. However, because of the divergent interests and claims of respondent Allen and the respondent family of the decedent below, we refer only to the decedent's family when we use the term "respondents" throughout this opinion.

[2] The District Court assumed that the Amite River is navigable at the site of the collision. Although the issue is not free from doubt, it appears from the opinion and the disposition of the Court of Appeals that the court found that the river is navigable at this site although seldom, if ever, used for commercial traffic. This opinion is premised on our understanding that the river at this point is navigable, see Brief for Petitioners 20, but we leave open the question whether petitioners have preserved the opportunity to argue this issue upon further development of facts in the District Court.

in any kind of 'traditional maritime activity' either before
or at the time of the accident;

"(7) Neither of the boats involved were under hire in
any traditional maritime form;

"(8) There is no evidence to indicate that any 'commer-
cial activity', even in the broadest admiralty sense, had
ever been previously engaged in by either of the boats in
question, and in fact the two boats would have to be clas-
sified as 'purely pleasure craft', not in any way 'involved
in commerce', and,

"(9) There was no other instrumentality involved in this
accident that had even a minor relationship to 'admiralty'
or 'commerce', i. e. a buoy, barge, oil drilling apparatus,
etc."   470 F. Supp. 699, 700 (1979).

After reviewing decisions of this Court and the Fifth Cir-
cuit, as well as relevant commentary, the District Court
found that there must be some relationship with traditional
maritime activity for an injury sustained on navigable water
to fall within federal admiralty jurisdiction.   The District
Court held that commercial maritime activity is necessary to
satisfy this relationship, and granted petitioners' motion to
dismiss the complaint for lack of subject-matter jurisdiction
because the collision of these two pleasure boats did not in-
volve any commercial activity.

The Court of Appeals reversed.   641 F. 2d 314 (1981).
The Court of Appeals agreed that *Executive Jet, supra,* and
relevant Fifth Circuit decisions establish that "admiralty ju-
risdiction requires more than the occurrence of the tort on
navigable waters—that additionally there must be a signifi-
cant relationship between the wrong and traditional maritime
activity."   641 F. 2d, at 315.   It disagreed with the District
Court, however, on the application of this principle to the
undisputed facts of this case.   Relying on the fact that the
"Rules of the Road" govern all boats on navigable waters,
and on the uncertainty that would accompany a finding of no
admiralty jurisdiction in this case, the Court of Appeals held

that "two boats, regardless of their intended use, purpose, size, and activity, are engaged in traditional maritime activity when a collision between them occurs on navigable waters." *Id.*, at 316.[3]

## II

Prior to our opinion in *Executive Jet*, there was little question that a complaint such as the one filed here stated a cause of action within federal admiralty jurisdiction. Indeed, the *Executive Jet* Court begins its opinion by observing that, under the traditional rule of admiralty jurisdiction, "[i]f the wrong occurred on navigable waters, the action is within admiralty jurisdiction." 409 U. S., at 253 (citing *Thomas* v. *Lane*, 23 F. Cas. 957, 960 (No. 13,902) (CC Me. 1813) (Story, J., on Circuit). See also *The Plymouth*, 3 Wall. 20, 36 (1866) ("Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance"). Under this rule, an action arising out of a collision between two pleasure boats on navigable waters clearly falls within the admiralty jurisdiction of the district courts. When presented with this precise situation in the past, this Court has found it unnecessary even to discuss whether the district court's admiralty jurisdiction had been properly invoked, instead assuming the propriety of such jurisdiction merely because the accident occurred on navigable waters. *Levinson* v. *Deupree*, 345 U. S. 648, 651 (1953). See also *Just* v. *Chambers*, 312 U. S. 383 (1941) (injury to guest from carbon monoxide poisoning in the cabin of a pleasure boat). Cf. *Coryell* v. *Phipps*, 317 U. S. 406 (1943). In light of these decisions, we address here only the narrow question whether *Executive Jet* disapproved these earlier decisions *sub silentio*.

---

[3] Judge Thornberry, concurring in part and dissenting in part, argued that federal admiralty jurisdiction could not be sustained if the river at the site of the accident, although navigable, did not also function as an integral or major "artery of commerce." 641 F. 2d, at 317.

In *Executive Jet*, this Court held that a suit for property damage to a jet aircraft that struck a flock of sea gulls upon takeoff and sank in the navigable waters of Lake Erie did not state a claim within the admiralty jurisdiction of the district courts. In reaching this conclusion, the Court observed that the mechanical application of the locality rule as the sole test for determining whether there is admiralty jurisdiction had been widely criticized by commentators, and that the federal courts and Congress had been compelled to make exceptions to this approach in the interests of justice in order to include certain torts with no maritime locality. The Court determined that claims arising from airplane accidents are cognizable in admiralty only when the wrong bears a significant relationship to traditional maritime activity. 409 U. S., at 268. Given the realities of modern-day air travel, the *Executive Jet* Court held that, "in the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States." *Id.*, at 274.

The express holding of *Executive Jet* is carefully limited to the particular facts of that case. However, the thorough discussion of the theoretical and practical problems inherent in broadly applying the traditional locality rule has prompted several courts and commentators to construe *Executive Jet* as applying to determinations of federal admiralty jurisdiction outside the context of aviation torts. See, *e. g., Kelly* v. *Smith*, 485 F. 2d 520 (CA5 1973); Calamari, The Wake of Executive Jet—A Major Wave or a Minor Ripple, 4 Maritime Law. 52 (1979). We believe that this is a fair construction. Although *Executive Jet* addressed only the unique problems associated with extending admiralty jurisdiction to aviation torts, much of the Court's rationale in rejecting a strict locality rule also applies to the maritime context. Indeed, the *Executive Jet* Court relied extensively on admiralty and maritime decisions of this Court and on congressional action ex-

tending admiralty jurisdiction to torts with a significant relationship to traditional maritime activity, but with no maritime locality.[4]

We recognize, as did the Court of Appeals, that the *Executive Jet* requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context. We also agree that there is no requirement that "the maritime activity be an exclusively commercial one." 641 F. 2d, at 316. Because the "wrong" here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court.

We are not persuaded by petitioners' argument that a substantial relationship with commercial maritime activity is necessary because commercial shipping is at the heart of the traditional maritime activity sought to be protected by giving the federal courts exclusive jurisdiction over all admiralty suits. This argument is premised on the faulty assumption that, absent this relationship with *commercial* activity, the need for uniform rules to govern conduct and liability disappears, and "federalism" concerns dictate that these torts be litigated in the state courts.

Although the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce, petitioners take too narrow a view of the federal interest sought to be protected. The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdic-

---

[4] In addition to noting these examples where strict application of the locality rule would have deprived the courts of admiralty jurisdiction despite a clear connection to maritime activity, the Court noted the difficulties of extending jurisdiction to torts with a maritime locality, but absolutely no connection to maritime activity. See 409 U. S., at 255–256 (disapproving decisions sustaining admiralty jurisdiction over claims by swimmers injured by other swimmers or submerged objects in shallow waters near shore); *id.*, at 256–257 (approving decisions requiring some connection with traditional maritime activity).

tion is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce. For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity. Furthermore, admiralty law has traditionally been concerned with the conduct alleged to have caused this collision by virtue of its "navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters." *Executive Jet*, 409 U. S., at 270. The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation,[5] compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.

Yet, under the strict commercial rule proffered by petitioners, the status of the boats as "pleasure" boats, as opposed to "commercial" boats, would control the existence of admiralty jurisdiction. Application of this rule, however, leads to inconsistent findings or denials of admiralty jurisdiction similar to those found fatal to the locality rule in *Executive Jet*. Under the commercial rule, fortuitous circum-

---

[5] Not every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction. In *Executive Jet*, for example, we concluded that the sinking of the plane in navigable waters did not give rise to a claim in admiralty even though an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity. However, when this kind of potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of the boats in this case, admiralty jurisdiction is appropriate.

stances such as whether the boat was, or had ever been, rented, or whether it had ever been used for commercial fishing, control the existence of federal-court jurisdiction. The owner of a vessel used for both business and pleasure might be subject to radically different rules of liability depending upon whether his activity at the time of a collision is found by the court ultimately assuming jurisdiction over the controversy to have been sufficiently "commercial." We decline to inject the uncertainty inherent in such line-drawing into maritime transportation. Moreover, the smooth flow of maritime commerce is promoted when all vessel operators are subject to the same duties and liabilities. Adopting the strict commercial rule would frustrate the goal of promoting the smooth flow of maritime commerce, because the duties and obligations of noncommercial navigators traversing navigable waters flowing through more than one State would differ "depending upon their precise location within the territorial jurisdiction of one state or another." 641 F. 2d, at 316.

Finally, our interpretation is consistent with congressional activity in this area. First, Congress defines the term "vessel," for·the purpose of determining the scope of various shipping and maritime transportation laws, to include all types of waterborne vessels, without regard to whether they engage in commercial activity. See, e. g., 1 U. S. C. § 3 ("'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"). Second, the federal "Rules of the Road," designed for preventing collisions on navigable waters, see, e. g., 94 Stat. 3415, 33 U. S. C. § 2001 et seq. (1976 ed., Supp. IV), apply to all vessels without regard to their commercial or noncommercial nature.[6] Third, when it ex-

---

[6] Petitioners argue that admiralty jurisdiction in the federal courts is unnecessary to ensure the uniform application of the Rules of the Road to boat navigation because state courts are bound by the construction federal courts give to statutes relating to navigation. Assuming that petitioners

tended admiralty jurisdiction to injuries on land caused by ships on navigable waters, Congress directed that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury . . *caused by a vessel on navigable water. . . .*" Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U. S. C. § 740.[7]

In light of the need for uniform rules governing navigation, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional test tied to the commercial use of a given boat, we hold that a complaint alleging a collision between two vessels on navigable waters properly states a claim within the admiralty jurisdiction of the federal courts. Therefore, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

No trend of decisions by this Court has been stronger—for two decades or more—than that toward expanding federal jurisdiction at the expense of state interests and state-court jurisdiction. Of course, Congress also has moved steadily and expansively to exercise its Commerce Clause and preemptive power to displace state and local authority. Often decisions of this Court and congressional enactments have been necessary in the national interest. The effect, never-

---

are correct, this fact does not negate the importance that Congress has attached to the federal interest in having all vessels operating on navigable waters governed by uniform rules and obligations, which is furthered by consistent application of federal maritime legislation under federal admiralty jurisdiction.

[7] We refer to this language only to demonstrate that Congress did not require a commercial-activity nexus when it extended admiralty jurisdiction. We express no opinion on whether this Act could be construed to provide an independent basis for jurisdiction.

theless, has been the erosion of federalism—a basic principle of the Constitution and our federal Union.

Today's Court decision, an example of this trend, is not necessary to further any federal interest. On its face, it is inexplicable. The issue is whether the federal law of admiralty, rather than traditional state tort law, should apply to an accident on the Amite River in Louisiana between two small boats. "One was an eighteen foot pleasure boat powered by a 185 h.p. Johnson outboard motor that was being used for water skiing purposes at the time of the accident. The other was a sixteen foot 'bass boat' powered by an outboard motor that was used exclusively for pleasure fishing." 470 F. Supp. 699, 700 (MD La. 1979). It also is undisputed that both boats were used "exclusively for pleasure"; that neither had ever been used in any "commercial maritime activity"; that none of the persons aboard the boats had ever been engaged in any such activity; and that neither of the boats was used for hire. *Ibid.* The Court of Appeals conceded that "the place where the accident occurred is seldom, if ever, used for commercial activity." 641 F. 2d 314, 316 (CA5 1981).

The absence of "commercial activity" on this waterway was held by the Court of Appeals to be immaterial. While recognizing that there was substantial authority to the contrary, the court held that federal admiralty law applied to this accident. This Court now affirms in a decision holding that "all operators of vessels on navigable waters are subject to uniform [federal] rules of conduct," conferring federal admiralty jurisdiction over *all* accidents. *Ante,* at 675 (emphasis deleted). In my view there is no substantial federal interest that justifies a rule extending admiralty jurisdiction to the edge of absurdity. I dissent.

I

*Executive Jet Aviation, Inc.* v. *City of Cleveland,* 409 U. S. 249 (1972), established that admiralty jurisdiction does

*not* extend to every accident on navigable waters. The Court today misconstrues *Executive Jet*. We emphasized in that case that it is "consistent with the history and purpose of admiralty to require . . . that the wrong bear a *significant* relationship to *traditional maritime activity*." *Id.*, at 268 (emphasis added). We acknowledged that "in a literal sense there may be some similarities between the problems posed for a plane downed on water and those faced by a sinking ship." *Id.*, at 269. But, recalling that "[t]he law of admiralty has evolved over many centuries," *ibid.*, we noted that admiralty was "concerned with [matters such as] maritime liens, the general average,[1] captures and prizes, limitation of liability, cargo damage, and claims for salvage." *Id.*, at 270. "It is clear, therefore, that neither the fact that a plane goes down on navigable waters nor the fact that the negligence 'occurs' while a plane is flying over such waters is enough to create such a relationship to *traditional maritime activity* as to justify the invocation of admiralty jurisdiction." *Id.*, at 270–271 (emphasis added).

*Executive Jet*'s recognition that "[t]he law of admiralty has evolved over many centuries," *id.*, at 269, provides the appropriate understanding of that case's "traditional maritime activity" test. Admiralty is a specialized area of law that, since its ancient inception, has been concerned with the problems of seafaring *commercial* activity.[2] As Professor Stolz

---

[1] The doctrine of general average refers to rules for dividing the loss suffered when cargo must be thrown overboard in order to lighten a ship. See generally G. Gilmore & C. Black, The Law of Admiralty 244–271 (2d ed. 1975).

[2] "Maritime courts, differing somewhat in name and somewhat in jurisdiction, have been established in all civilized nations at various periods in their history. The dates of their establishment may be said, because of the circumstances which brought them into being, to afford a very fair test of the advancement in civilization of their respective nations.

"In every case their establishment has been due to the same cause, the necessities of *commerce*." T. Etting, The Admiralty Jurisdiction in America 7–8 (1879) (emphasis added).

has demonstrated, "[t]here can be no doubt that historically the civil jurisdiction of admiralty was .exclusively concerned with matters arising from maritime commerce." Stolz, Pleasure Boating and Admiralty: *Erie* at Sea, 51 Calif. L. Rev. 661, 667 (1963). "The only valid criterion of the admiralty jurisdiction is the relation of the matter—whether it be tortious or contractual in nature—to *maritime commerce*." 7A J. Moore & A. Pelaez, Federal Practice, Admiralty ¶.325[5], p. 3606 (2d ed. 1982) (emphasis in original).[3]

This case involves only pleasure craft. Neither of these boats had ever been used in any commercial activity. There is, therefore, no connection with any historic federal admiralty interest. In centuries past—long before modern means of transportion by land and air existed—rivers and oceans were the basic means of commerce, and the vessels that used the waterways were limited primarily to commercial and naval purposes.[4] "Pleasure boating is basically a

---

[3] See also Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Colum. L. Rev. 259, 280 (1950) ("The main thing is that if the court of admiralty is to exist at all, it should exist because the *business of river, lake, and ocean shipping* calls for supervision by a tribunal enjoying a particular expertness in regard to the more complicated concerns of that *business*") (emphasis added); Swaim, Yes, Virginia, There is an Admiralty: The *Rodrigue* Case, 16 Loyola L. Rev. 43, 44 (1970) ("Maritime commerce— and nothing more—is the *raison d'etre* for the courts and rules of admiralty"); Bridwell & Whitten, Admiralty Jurisdiction: The Outlook for the Doctrine of *Executive Jet*, 1974 Duke L. J. 757, 793; Comment, 12 Cal. Western L. Rev. 535, 558, n. 133 (1976) ("The historical justification for admiralty law and courts is commercial. Its law was designed to meet commercial needs and practice"); Note, 34 Wash. & Lee L. Rev. 121, 139– 140 (1977) ("Those pleasure craft torts occurring on commercially navigable waters must be considered in light of the historical design of admiralty jurisdiction to determine whether the exercise of jurisdiction furthers the commercial interests which admiralty courts were created to serve").

[4] At the beginning of the 19th century, "the commerce of the country was almost entirely limited to the foreign and coasting.trade. The only roads which existed led from the woods to the principal towns on navigable

new phenomenon, the product of a technology that can produce small boats at modest cost and of an economy that puts such craft within the means of almost everyone."[5] Stolz, *supra*, at 661. Thus, the "traditional" connection emphasized in *Executive Jet* is absent where pleasure boats are concerned. Moreover, even the Court today is hard put to identify an arguably substantial federal admiralty interest *of any kind*. I now comment briefly on the Court's reasoning.

---

waters. There was but one connected route from North to South at the commencement of the Revolution, and this was true also when the Constitution was framed. Even in 1796 the only roads with which the States were much concerned were those which led to navigable waters; the care of 'cross roads,' as the roads leading from State to State were called by one who had been a member of the Constitutional Convention, the States were unwilling to assume. 'Fifty miles back from the waters of the Atlantic the country was an unbroken jungle.' In the vigorous phrase used by Henry Clay, 'the country had scarcely any interior.' Turnpike roads did not come into general use until the nineteenth century." E. Prentice, The Federal Power over Carriers and Corporations 59–60 (1907) (footnotes omitted).

[5] For this reason, the jurisdictional issue in this case is relatively new and, until today, has not been addressed by this Court. The Court's contrary suggestion, *ante*, at 672, relies on irrelevant dicta from decisions of the last century that do not involve pleasure craft. *E. g.*, *The Plymouth*, 3 Wall. 20, 36 (1866) (holding admiralty jurisdiction does *not* include adjudication of a loss of packing-houses on a wharf that arose from fire on an adjacent *merchant* ship at anchor). The Court also cites cases apparently involving pleasure boats in which the jurisdictional question was not at issue. See *Levinson* v. *Deupree*, 345 U. S. 648, 651 (1953); *Coryell* v. *Phipps*, 317 U. S. 406 (1943); *Just* v. *Chambers*, 312 U. S. 383 (1941). "[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974).

The jurisdictional issue has both a constitutional and a statutory element, since both Art. III and 28 U. S. C. § 1333 must support the exercise of jurisdiction in this case. The Court necessarily must find that both provisions are satisfied. Because construction of the statute is sufficient to support the result I would reach, I intimate no views on the constitutional extent of Art. III admiralty jurisdiction.

## II

The Court's justification for extending federal admiralty jurisdiction to the use of millions[6] of small pleasure boats on the countless rivers, streams, and inlets of our country is the need for "uniform rules of conduct." *Ante*, at 675. I agree, of course, that standard codes should govern traffic on waterways, just as it is crucial that certain uniform rules of traffic prevail on neighborhood streets as well as interstate highways. But this is no reason for admiralty jurisdiction to be extended to all boating activity. Congress has provided some rules governing water traffic, just as it has done for some land traffic. See 23 U. S. C. § 154 (55 m.p.h. speed limit). Yet no one suggests that federal jurisdiction is needed to prevent chaos in automobile traffic, or that only federal courts are qualified to try accident cases.

State courts are duty bound to apply federal as well as local "uniform rules of conduct." See *Testa* v. *Katt*, 330 U. S. 386 (1947). The Court does not suggest that state courts lack competency to apply federal as well as state law to this type of water traffic. And this Court stands ready, if necessary, to review state decisions to ensure that important issues of federal law are resolved correctly. As Judge Thornberry said in dissent in this case, "the desire for certainty cannot alone justify the assumption of federal control over matters of purely local concern . . . ." 641 F. 2d, at 317. Consequently the Court's premise that there is a need for uniform traffic rules fails to support its conclusion that federal jurisdiction must be extended to cover the type of activity that typically involves small pleasure craft.

In an effort to rescue its logic, the Court refers to the "potential disruptive impact of a collision between boats on navigable waters . . . ." *Ante*, at 675. Yet this reasoning is

---

[6] There were 14.3 million pleasure boats in the United States in 1980. See U. S. Dept. of Transportation, U. S. Coast Guard, Boating Statistics 1980, p. 8 (1981).

countered by *Executive Jet*—a decision that the Court acknowledges to be a key authority for this case. For if "potential disruptive impact" on traffic in navigable waters provides a sufficient connection with "traditional maritime activity," then the crash of an *airplane* "in the navigable waters of Lake Erie," 409 U. S., at 250, necessarily would support admiralty jurisdiction. The holding of *Executive Jet* is precisely to the contrary. The Court's reasoning in essence resurrects the locality rule that *Executive Jet* rejected, for *any* accident "located" on navigable waters has a "potential disruptive impact" on traffic there.[7]

---

[7] If a "potential disruptive effect" on interstate traffic in fact implicated a federal interest strong enough to support federal jurisdiction, then federal courts also should hear cases in which accidents disrupt similar *land* traffic. Cf. "71 Feared Dead as Plane Hits Bridge, Smashes Cars, Plunges Into Potomac," Washington Post, Jan. 14, 1982, p. A1, col. 1.

According to the Court, the interest in expanding admiralty jurisdiction is supported by the difficulty of defining "pleasure boating." *Ante*, at 675–676. In view of the myriad of definitional tasks performed regularly by state and federal courts, determining in a particular case whether the boating at issue is essentially for pleasure rather than commerce rarely would present a difficult problem for any court.

The Court also states that its action "is consistent with congressional activity in this area," *ante*, at 676, citing a number of federal statutes. This point is of course wholly irrelevant to the *constitutional* extent of admiralty jurisdiction. Moreover, the only statute cited having any relation to jurisdictional matters is the Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U. S. C. § 740. This Act provides:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, *notwithstanding that such damage or injury be done or consummated on land.*

"In any such case suit may be brought in rem or in personam according to the principles of law and rules of practice obtaining in cases *where the injury or damage has been done and consummated on navigable water*" (emphasis added).

As its text makes plain, "[t]his Act was passed specifically to overrule cases, such as *The Plymouth, supra,* holding that admiralty does not provide a remedy for damage done to land structures by ships on navigable

Oral argument in this case revealed the degree to which the Court's decision displaces state authority. The Court posed a hypothetical in which children, for their own amusement, used rowboats to net crawfish from a stream. Two of the boats collide and sink near the water's edge, forcing the children to wade ashore. Counsel for respondents replied that this accident *would* fall within the admiralty jurisdiction of the federal courts, provided that the waterway was navigable. Tr. of Oral Arg. 24. Today the Court agrees.

For me, however, this example illustrates the substantial—and *purposeless*—expansion of federal authority and federal-court jurisdiction accomplished by the Court's holding. In this respect I agree with Chief Judge Haynsworth:

> "The admiralty jurisdiction in England and in this country was born of a felt need to protect the domestic shipping industry in its competition with foreign shipping, and to provide a uniform body of law for the governance of domestic and foreign shipping, engaged in the movement of commercial vessels from state to state and to and from foreign states. The operation of small pleasure craft on inland waters which happen to be navigable has no more apparent relationship to that kind of concern than the operation of the same kind of craft on artificial inland lakes which are not navigable waters." *Crosson* v. *Vance*, 484 F. 2d 840 (CA4 1973).

---

waters." *Executive Jet*, 409 U. S., at 260. This purpose—and not any intent to expand or affect admiralty jurisdiction respecting pleasure boats—consistently appears in the Act's legislative history. See, *e. g.*, S. Rep. No. 1593, 80th Cong., 2d Sess., 1–6 (1948); H. R. Rep. No. 1523, 80th Cong., 2d Sess., 1–6 (1948). See also Farnum, Admiralty Jurisdiction and Amphibious Torts, 43 Yale L. J. 34, 44–45 (1933); Note, 63 Harv. L. Rev. 861, 868 (1950); Note, The Extension of Admiralty Jurisdiction to Include Amphibious Torts, 37 Geo. L. J. 252 (1949); Note, Effects of Recent Legislation Upon the Admiralty Law, 17 Geo. Wash. L. Rev. 353 (1949). And this Court has never sustained the constitutionality of this Act.

With respect, the Court's statutory arguments must be regarded as makeweights.

In the rowboat example, as in the case at bar, the Federal Government has little or no genuine interest in the resolution of a garden variety tort case. "Only the burdening of the federal courts and the frustration of the purposes of state tort law would be thereby served." *Adams* v. *Montana Power Co.*, 528 F. 2d 437, 440–441 (CA9 1975).[8]

The Court's opinion largely ignores the fact that expansions of federal admiralty jurisdiction are accompanied by application of substantive—and *pre-empting*—federal admiralty law. *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205, 214–218 (1917); see *Kossick* v. *United Fruit Co.*, 365 U. S. 731, 738–742 (1961).[9] "The chief objection to application of admiralty law to pleasure boating is that it implicitly prohibits the exercise of state legislative power in an area in which local legislatures have generally been thought competent and in which Congress cannot be expected either to be interested or to be responsive to local needs." Stolz, 51 Calif. L. Rev., at 664. For me, this federalism concern is the dominating issue in the case. I agree that "the law of pleasure boating will develop faster and more rationally if the creative capacities of the state courts and legislatures are freed of an imaginery *[sic]* federal concern with anything that floats on navigable waters." *Id.*, at 719.

Federal courts should not displace state responsibility and choke the federal judicial docket on the basis of federal con-

---

[8] In construing the extent of 28 U. S. C. § 1333 admiralty jurisdiction, see n. 5, *supra*, I would prefer to leave to Congress an extension of federal authority of this magnitude. See n. 6, *supra*. Congress has the power to hold hearings and to weigh factors beyond the proper competency of a court.

[9] "It should be emphasized . . . that, in the law of admiralty, the term 'jurisdiction' denotes both the power of a court to hear and dispose of a certain controversy, and also the power to prescribe rules of decision to be applied by those courts considering the controversy. This is so because a court of admiralty sits solely to administer and apply the maritime law." Swaim, *supra* n. 3, at 43 (footnotes and emphasis omitted).

cerns that in truth are only "imaginary." In accord with the teaching of *Executive Jet*, I would not extend federal admiralty jurisdiction beyond its traditional roots and reason for existence. I dissent from the Court's decision to sever a historic doctrine from its historic justification.