*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0345p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NEW HAMPSHIRE INSURANCE CO.,
                    *Plaintiff-Appellant,*

      *v.*

No. 08-3902

HOME SAVINGS AND LOAN CO. OF
YOUNGSTOWN, OHIO, et al.,
                    *Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 05-02179—James S. Gwin, District Judge.

Argued: March 13, 2009

Decided and Filed: September 24, 2009

Before: BATCHELDER, Chief Judge; CLAY, Circuit Judge; COX, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Edward R. Goldman, RENDIGS, FRY, KIELY & DENNIS, L.L.P., Cincinnati, Ohio, for Appellant. Robert S. Fulton, NEWMAN, OLSON & KERR, Canfield, Ohio, Rosemary Taft Milby, WELTMAN, WEINBERG & REIS CO., L.P.A., Cleveland, Ohio, for Appellees. **ON BRIEF:** Edward R. Goldman, Donald C. Adams, Jr., RENDIGS, FRY, KIELY & DENNIS, L.L.P., Cincinnati, Ohio, for Appellant. Robert S. Fulton, NEWMAN, OLSON & KERR, Canfield, Ohio, Rosemary Taft Milby, WELTMAN, WEINBERG & REIS CO., L.P.A., Cleveland, Ohio, Michael D. Rossi, GUARNIERI & SECREST, P.L.L., Warren, Ohio, for Appellees.

_____

[*] The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiff, New Hampshire Insurance Company ("New Hampshire" or "NHIC"), appeals from the district court's order and judgment granting Defendants' motion to dismiss pursuant to its discretion to decline to exercise jurisdiction over claims brought under the Declaratory Judgment Act of 1934, 28 U.S.C. § 2001.  Applying the *Brillhart*/*Wilton* abstention framework, the district court dismissed New Hampshire's complaint in favor of parallel proceedings pending in Ohio state court. On appeal, New Hampshire challenges the district court's application of the *Brillhart*/*Wilton* doctrine, contending that several factors support federal jurisdiction.

For the reasons set forth herein, we **REVERSE** the district court's assumption that it has jurisdiction and **VACATE** its analysis of the abstention issue, but **AFFIRM** its judgment dismissing NHIC's claims, although on different grounds.

**I.**

In November 2003, National Marine, Inc. ("National Marine"), a yacht dealer and marina operator, purchased a "Yacht Dealer/Marina Operators" general liability insurance policy from NHIC.  The policy covered both "Yacht Dealer Operations" and "Marina Operations," as those terms are defined in the contract.  ROA at 67. Generally speaking, the policy insured National Marine against loss or damage to its inventory, loss or damage to third-party property while in its custody, personal injury or property damage occurring on its boats or at its marina, and loss or damage to its tools and equipment.  The policy also includes $300,000 in "Truth in Lending Errors and Omissions Liability Coverage," to insure against any damage due to "the unintentional violation of any Federal or State Consumer Credit Act, or similar statute, law or ordinance."  ROA at 61.

In November 2004, several of National Marine's customers and two banks sued National Marine in the Court of Common Pleas in Trumbull County, Ohio, s*ee Suhar*

*v. Lukowski*, No. 04-CV-2779, alleging that National Marine made fraudulent misrepresentations and failed to deliver certain boats with clean title, as promised. These former customers and banks sought recovery for breach of contract, fraud, and violation of the Ohio Consumer Sales Practices Act. National Marine filed a claim with NHIC under the "Truth in Lending" provision of the policy, requesting legal defense and indemnification from the charges.

NHIC provided coverage under reservation of rights, but also sued in federal court naming all the parties that had been named in the state court action, including Home Savings & Loan Company of Youngstown, Ohio ("Home Savings"), Sky Bank Financial Group ("Sky Bank"), National Marine Inc. and its predecessor National Marine & Auto (collectively "National Marine"), Andrew Suhar, receiver for National Marine, and additional individual defendants. Because one of these defendants was a New York resident and NHIC is a corporation with its principal place of business in New York, NHIC could not establish federal jurisdiction based on diversity. *See* 28 U.S.C. § 1332. NHIC instead asserted that jurisdiction existed under 28 U.S.C. § 1333(1), federal maritime jurisdiction. NHIC's complaint asked the district court to rescind the policy (on misrepresentation grounds) or declare that it did not cover these charges.

In light of the pending state court proceedings, Sky Bank moved to dismiss this action in October 2005. Home Savings subsequently joined that motion. Defendants' motion primarily argued that the federal district court should abstain from exercising its discretionary jurisdiction under the Declaratory Judgment Act because prior state court proceedings would resolve the same factual and legal disputes between the same parties.

Due to a November 2005 bankruptcy filing by one of the defendants, the district court stayed the federal proceedings without resolving the Defendants' motion to dismiss. After the case was reopened in March 2008, NHIC filed its opposition to the motion to dismiss. Home Savings filed a reply brief in support of the motion.

In May 2008, before the district court resolved Defendants' motion, NHIC filed an amended complaint seeking additional relief, including an order that the insurance policy at issue was void *ab initio* due to material misrepresentations in the policy

application by National Marine.  In addition to this rescission claim, NHIC also sought restitution, costs, and attorney fees.

On June 16, 2008, the district court dismissed the case without prejudice, framing NHIC's complaint as a request for declaratory judgment and concluding that, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), it had discretion to accept or deny jurisdiction.  Because the Declaratory Judgment Act does not provide for its own federal subject matter jurisdiction, the court stated that it would *assume* subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) because the insurance policy at issue was a "marine insurance policy."  The court then proceeded to hold that *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942), and *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), provided the appropriate framework for resolving Defendants' motion and that the factors set forth in those decisions supported abstention.  The district court rejected NHIC's contention that its claims for additional relief rendered the *Brillhart*/*Wilson* framework inapposite, declining to apply the "exceptional circumstances" test set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

This timely appeal followed.

**II.**

The district court assumed that NHIC had established federal subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1) because the insurance policy at issue was a "marine insurance policy," and the parties have not contested this assumption on appeal.  But "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*." *Answers in Genesis of Ky., Inc. v. Creation Ministries Intern., Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009).  As an initial matter, then, we must fulfil our duty to determine whether NHIC's claims fall within the scope of our federal maritime jurisdiction.

**A.**

Whether this dispute falls within the scope of our jurisdiction under 28 U.S.C. § 1333(1) depends upon whether the underlying claims arise under a "maritime contract," which in turn "depends upon the nature and character of the contract, and the true criterion is whether [the contract] has reference to maritime service or maritime transactions." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (quotation marks, citations, and editorial marks omitted).

The "Yacht Dealers/Marina Operators" policy that NHIC issued to National Marine covers both "Yacht Dealer Operations" and "Marina Operations," as those terms are defined in the policy. ROA at 67. With respect to the operation of the marina, the policy covers repairs, moorings of slips, hauling and launching of craft, and other marina services. ROA at 63. The policy also covers certain operations and services with respect to "pleasure craft covered by this policy which are being operated . . . within a 500 mile radius of the insured's premises." ROA at 67. The policy does not cover any particular vessel or any particular commercial transaction. In fact, the policy appears to exclude any "owned water craft" from coverage. ROA at 40. With respect to the yacht dealer operations, the policy provides insurance coverage for "stock for sale," which includes "vessel[s] being held for sale by [the insured] or in [the insured's] care, custody or control, but only while such vessel[s are] afloat." ROA at 58, 65. The policy also includes, with respect to both operations, $300,000 in "Truth in Lending Errors and Omissions Liability Coverage," to insure against any damage due to "the unintentional violation of any Federal or State Consumer Credit Act, or similar statute, law or ordinance." ROA at 61.

Simply because this insurance policy relates to boats and a marina does not necessarily imply that it is a "maritime contract." As the Supreme Court explained in *Kirby*, "[t]o ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case." 543 U.S. at 23. Rather, we must "focus[] our inquiry on whether the *principal objective* of a contract is maritime *commerce*." *Id.* at 25 (emphasis added);

*accord Sisson v. Ruby*, 497 U.S. 358, 367 (1990) ("The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" (quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982))). After the Court's decision in *Kirby*, there can be no doubt that our inquiry into whether a contractual dispute falls within our maritime jurisdiction must focus on whether the contract's "primary objective" has an "essentially maritime nature" and relates to "maritime commerce." 543 U.S. at 24-25 (finding that the contracts at issue were "maritime contracts" because "their *primary objective* is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States" (emphasis added)). In conducting this inquiry, *Kirby* also requires us to consider the contract as a whole. *See id.* at 24-26.

Although defining the central concern of our inquiry, the Supreme Court's decision in *Kirby* offers very little guidance as to how we are to determine what in fact is the "primary objective" of a mixed contract. The Court's disapproval in *Kirby* of cases such as *Hartford Fire Insurance Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549 (2d Cir. 2000), raises serious questions as to whether the "incidental" test applied by our sister circuits still provides a valid approach, or whether the Court was rejecting only the application and geographical focus of that test. *See Kirby*, 543 U.S. at 26-27 (disapproving of the "incidental" test applied in *Hartford Fire* on the grounds that "it seems to us imprecise to describe the land carriage required by an intermodal transportation contract as 'incidental'" and "to the extent that these lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires."). The Court's decision in *Kirby* also does little to clarify how we are to treat contracts that are incidental to maritime commerce. *See Planned Premium Servs., Inc. v. Int'l Ins. Agents, Inc.*, 928 F.2d 164, 165-66 (5th Cir. 1991) ("The focus becomes even more fuzzy when the scope is brought to bear on that genre of conventions known as preliminary contracts, *i.e.*, contracts 'that involve preliminary services leading to maritime contracts.'" (citation omitted)).

**B.**

Confronting the same difficulty we face here, the Second Circuit has suggested that the jurisdictional analysis should include a "threshold inquiry" that asks whether the particular *dispute* between the parties—rather than the underlying contract as a whole—implicates maritime concerns. *See Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 312 (2d Cir. 2005) (holding that "prior to inquiring into the subject matter of the contract, we first make a 'threshold inquiry' into the subject matter of the dispute" (citing *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l)*, 85 F.3d 68, 74-75 (2d Cir. 1996))). If we were to accept and apply this test, we likely would conclude that this dispute falls outside the scope of our maritime jurisdiction inasmuch as the claims asserted by NHIC under the "Truth in Lending" provision of the policy do not implicate maritime commerce. However, we do not adopt the Second Circuit's approach. While we do not necessarily disagree with the Second Circuit's reasoning—in fact, we find it rather persuasive—we have serious reservations as to whether the focus of this "threshold inquiry" can be squared with controlling Supreme Court precedent.

Most importantly, the Supreme Court has never endorsed an inquiry into the subject matter of the dispute, despite its long history of dealing with precisely the types of claims at issue here, a point the Second Circuit acknowledged in *Folksamerica*, *see* 413 F.3d at 313-14 (noting "some uncertainty as to the extent to which [the] 'threshold inquiry' test survives the Supreme Court's most recent admiralty decision, *Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd.*" (citations omitted)). Instead, the Supreme Court consistently has held that "the nature and subject-matter of the contract at issue should be the crucial consideration in assessing admiralty jurisdiction." *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 US. 603, 611 (1991); *New Eng. Marine Mut. Ins. Co. v. Dunham*, 78 U.S. 1, 26 (1871) ("[T]he true criterion [to determining whether federal maritime jurisdiction exists over a contractual dispute] is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions."). Although the Supreme Court has acknowledged that

its decisions "do not draw clean lines between maritime and non-maritime contracts," *Kirby*, 543 U.S. at 23, its "abiding instruction," as even the Second Circuit has recognized, *Folksamerica*, 413 F.3d at 312, is that the "answer" to whether maritime jurisdiction exists "depends upon . . . the nature and character of the *contract*, and the true criterion is whether it has reference to maritime service or maritime transactions." *Kirby*, 543 U.S. at 24 (quotation marks and citations omitted).

By inquiring into the nature of the particular dispute, the Second Circuit's test improperly narrows the scope of our maritime jurisdiction by effectively raising the bar for plaintiffs seeking to bring a contractual claim in federal court under 28 U.S.C. § 1333(1). Under the Second Circuit's test, a case does not fall within the scope of our maritime jurisdiction where "the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992). Although this limitation appears reasonable to us, it ignores clear Supreme Court authority to the contrary. In *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961), for instance, the Court held that a shipowner's promise to assume responsibility for any improper treatment that his crew might receive at a New York hospital was a maritime contract, reasoning that this "fringe benefit" was "sufficiently related to peculiarly maritime concerns as not to put it, without more, beyond the pale of admiralty law." *Id.* at 736-38. In reaching that conclusion, the Court rejected the "narrow" reading of the contract espoused by the court of appeals in that case. *Id.* at 736. As the Court explained in *Kirby*, *Kossick* stands for the proposition that a dispute involving a "fringe benefit" of a maritime contract nevertheless falls within the purview of federal admiralty jurisdiction so long as that promise, although itself attenuated from the business of maritime commerce, "was in furtherance of a peculiarly maritime concern." *Kirby*, 543 U.S. at 24-25 (internal quotations, alterations, and citations omitted).

We also have concerns regarding the Second Circuit's formulation of this inquiry as a "threshold" matter, especially given that the approach mandated by the Supreme

Court already seems to address some of the concerns raised by the Second Circuit. According to the Supreme Court, even where a contract's primary objective is maritime commerce, not "every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955). Rather, interpreting a particular provision of a maritime contract "may so implicate local interests as to beckon interpretation by state law." *Kirby*, 543 U.S. at 27 (citing *Kossick*, 365 U.S. at 735). As the Supreme Court has put it, even where the dispute between the parties arises out of a "maritime contract," a reviewing court "must clear a second hurdle" and determine whether "this case" is "inherently local" before applying federal law. *Id.* Although this inquiry into the "inherently local" nature of the "case" addresses some of the same concerns underlying the threshold inquiry adopted by the Second Circuit, it operates slightly differently. Because this "second hurdle" arises only *after* the reviewing court is satisfied that the contract is a maritime contract, the "inherently local" nature of the case functions more like a basis for abstention than a prerequisite for jurisdiction.

Although we find the reasoning offered by the Second Circuit in support of its threshold inquiry to be reasonable and persuasive, we disagree that an inquiry concerned primarily (and initially) with the nature of the *dispute* can be squared with the approach mandated by the Supreme Court. We take the Supreme Court at its word that our inquiry should be focused on the nature and character of the *contract* as a whole, and thus we cannot accept the test developed by the Second Circuit.

## C.

The appeal of the Second Circuit's approach in a case such as this is that conducting a threshold inquiry into the subject matter of the dispute avoids the difficult questions involved in determining whether the "primary objective" of a multifaceted contract covering an array of concerns relates to maritime commerce. Because we cannot rely on the Second Circuit's approach, we must find some other way of unraveling this question. Despite our best efforts, however, we have not been able to divine an overarching principle or scheme that brings together all of the disparate

maritime contract cases under a single, unified banner. Although the Supreme Court repeatedly has acknowledged this difficulty, *see Kirby*, 543 U.S. at 23 ("Our cases do not draw clean lines between maritime and non-maritime contracts."); *Kossick*, 365 U.S. at 735 ("The boundaries of admiralty jurisdiction over contracts — as opposed to torts or crimes — being conceptual rather than spatial, have always been difficult to draw."); *Sisson v. Ruby*, 497 U.S. at 372 n.4 (Scalia, J., concurring) ("As Professor Black has put it, in the field of maritime contracts 'the attempt to project some "principle" is best left alone. There is about as much "principle" as there is in a list of irregular verbs. . . .'" (citation omitted)); *see also Planned Premium Servs.*, 928 F.2d at 165 ("The waters become murky when we seek the precise parameters of a maritime contract."), thus far it has offered very little in the way of guidance. Instead, the Court has endorsed a "conceptual" approach, encouraging courts to consider the contract as a whole and instructing that we should look for guidance in analogous precedent. *See Kossick*, 365 U.S. at 735 ("Precedent and usage are helpful insofar as they exclude or include certain common types of contract."). This is the approach the Supreme Court has prescribed, so it is the approach we must apply.

## III.

In determining whether the insurance policy before it in *Folksamerica* was a maritime contract, the Second Circuit reasoned that the scope of the coverage "determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured." 413 F.3d at 317. Other courts that have applied this functional approach have clarified that the focus of such an inquiry must be the "interests insured, and not simply the risks insured against." *Royal Ins. Co. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035, 1036 (9th Cir. 1984) ("For an insurance policy to be within admiralty jurisdiction, the *interests insured*, and not simply the risks insured against, must be maritime. For example, a beach front home might be insured against damage from 'perils of the sea,' but insurance of this sort on real property almost certainly is outside admiralty jurisdiction." (emphasis added)). Looking at the "interests insured" by the policy *sub judice*, we conclude that the weight of

authority indicates that this insurance policy is not a maritime contract because its "primary objective" does not relate to "maritime commerce." Consequently, we must dismiss this action for lack of subject matter jurisdiction over NHIC's claims. This result pretermits the other issues in this appeal.

### *Yacht Dealer Operations: Boats as Objects of Commerce not Agents of Commerce*

Setting aside for now the marina operations aspects of the policy, it is evident that the primary interests insured by the yacht-dealer provisions of the policy do not relate to maritime commerce. By its very terms, the yacht-dealer provisions relate to boats as objects of commerce— *i.e.*, "stock for sale"—not as agents of maritime commerce. ROA at 58. Although not dispositive of how we construe the overall contract, this conceptual distinction implies that this portion of the policy is not a maritime contract. *See Kossick*, 365 U.S. at 736 (explaining that "'[t]he only question is whether the transaction relates to ships and vessels, masters and mariners, *as the agents of commerce*'" (quoting 1 E. Benedict, Admiralty 131 (6th ed. 1940)) (emphasis added)); *see also CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 379 (2d Cir. 1982) (explaining that "[t]raditional texts have defined a 'maritime' contract as one that, for example, 'relat[es] to a ship *in its use as such*'" (citations omitted) (emphasis added)).

In addition to being supported by precedent, this conceptual distinction makes sense in this case, given that no one would dispute that these provisions, especially the "Truth in Lending Errors and Omissions Liability Coverage" which insures the policyholder against any damage due to "the unintentional violation of any Federal or State Consumer Credit Act, or similar statute, law or ordinance," bear in any significant way on maritime commerce.

### *Marina Operations: Contracts Related to Particular Vessels vs. Fixed Structures*

Construing those provisions of the policy that relate to the operation of the marina presents a more difficult question. At first blush, the case law seems to support the notion that the terms of the marina operation provisions of this policy bear directly

on maritime commerce. For example, in *Sisson v. Ruby*, the Supreme Court considered the maritime nature of a marina for purposes of maritime jurisdiction in a tort case, and offered the following assessment:

> Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity. At such a marina, vessels are stored for an extended period, docked to obtain fuel or supplies, and moved into and out of navigation. Indeed, most maritime voyages begin and end with the docking of the craft at a marina. We therefore conclude that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.

497 U.S. at 367. On closer inspection, however, we conclude that the case law actually suggests that insurance covering marina operations are not necessarily maritime contracts.

In discussing the importance of marina operations in *Sisson*, the Court was concerned with determining whether there was "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* at 364. That inquiry, however, is relevant only in the maritime tort context; jurisdiction predicated on a maritime contract requires no such inquiry. The distinction between maritime tort and contract law is significant, especially in this context where the Court has emphasized that "the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the *broad perspective* demanded by the second aspect of the [maritime tort] test." *Id.* at 367 (emphasis added). Unlike the test applied in the context of maritime contracts, maritime tort jurisdiction is broad enough to support "*any* other activities traditionally undertaken by vessels, commercial *or noncommercial*." *Id.* (emphasis added). As *Kirby* makes clear, this "broad perspective" is not applicable in the context of maritime contracts where the requisite inquiry is more "focus[ed]," and where we must determine whether the contract implicates a *commercial* activity. 543 U.S. at 25 ("The conceptual approach vindicates that interest by focusing the Court's inquiry on whether the principal objective of a contract is maritime commerce.").

The contract at issue in *Sisson* also is distinguishable on the grounds that it related to a specific boat, not the marina itself.  The policy at issue here relates specifically to the marina, and expressly excludes "owned water craft" from coverage.  ROA at 40. For these same reasons, the Court's decision in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982), likewise offers little guidance to resolving the question before us *sub judice*.

Next we consider *Wilburn Boat*, in which an insurance provider had insured the claimant's houseboat against loss from fire and other perils.  While moored on the lake, the boat was destroyed by fire.  The insurer refused to cover the claim and the claimant filed suit in state court.  348 U.S. at 311.  The insurer removed the case to federal court, and the federal court decided that the insurance policy at issue was a maritime contract sufficient to establish maritime jurisdiction. *Id*. at 312 n.4.  The Supreme Court accepted without comment the conclusion that insurance of a boat against fire while moored on a lake was a maritime contract, apparently presuming that the insurance policy constituted a maritime contract for purposes of the jurisdictional inquiry. *Id.* at 313.  Once again, though, the contract related to a specific vessel, not a fixed structure at which the boat happened to be docked.  Moreover, although the craft at issue in the case was a "small houseboat," the Court noted that the craft had been purchased by "merchants" primarily to "use for commercial carriage of passengers." *Id.* at 311.  We find these two elements of the policy at issue in *Wilburn Boat* to be conceptually significant. *See also Kirby*, 543 U.S. at 24 (finding that two bills of lading were maritime contracts "because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States").

Finally, we feel compelled to discuss *M/G Transport Services, Inc. v. Water Quality Insurance Syndicate*, 234 F.3d 974 (6th Cir. 2000).  In that case, this Court approved in a very conclusory fashion the district court's exercise of jurisdiction under § 1333(1), relying on *Stanley T. Scott & Co., Inc. v. Makah Development Corp.*, 496 F.2d 525, 526 (9th Cir. 1974), for the proposition that "a marine insurance policy is a 'maritime contract' for purpose of admiralty jurisdiction."  234 F.3d at 976-77.

Although this statement could be read to support the notion that all insurance policies touching on maritime concerns are maritime contracts, we do not read our decision in *M/G Transport* so broadly. Although we offered very little analysis as to why the insurance contract at issue there fell within the scope of our maritime contract jurisdiction, there are some contextual clues. For instance, we noted that the insured was a "subcontractor" hired to "transport[] coal via inland waterway to the Tennessee Valley Authority pursuant to a contract between R. & F. [the general contractor] and the United States." *Id.* at 975. We also noted that the contract involved "specialized marine pollution liability insurance," *id.* at 976, and thus presumably covered the operation of specific vessels operated by the company and related directly to the commercial activities specified in the coal transportation contract. In light of the particular facts of the case and applying the conceptual approach prescribed by the Supreme Court, we read our decision in *M/G Transport* to comport with the emphasis that *Kirby* places on whether the contract's "purpose is to effectuate maritime commerce." 543 U.S. at 27.

A survey of relevant case law supports the conceptual themes we have identified in these cases, especially the distinction between contracts related to the operation of a particular vessel involved in a commercial transaction and those related to fixed structures. For instance, the Ninth Circuit's decision in *Royal Insurance*, *supra*, suggests that contracts associated with fixed structures rather than a specific vessel generally are not maritime contracts. 738 F.2d at 1037 ("Wharfage contracts are maritime if wharfage is provided to a specific vessel. . . . If there is no connection to a specific vessel, however, contracts relating to wharves generally are not within admiralty jurisdiction."). Even the Supreme Court has attached significance to this distinction, noting that a "ship or vessel, used for navigation and commerce, though lying at a wharf, and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects," whereas a "fixed structure" that is "not used for the purpose of navigation" generally is not. *Cope*

*v. Vallette Dry Dock Co.*, 119 U.S. 625, 627-28 (1887) (holding that a libel against a dry-dock[1] does not fall within the admiralty jurisdiction of the federal courts).

The D.C. Circuit also offered an insightful discussion of this conceptual distinction in *Upper Steamboat Co. v. Blake*, 2 App. D.C. 51 (D.C. Cir. 1893):

> That wharves, piers, docks, or landing places, are essential as means of conducting maritime trade and commerce, must of course be conceded. But does it follow that all contracts relating to such wharves and docks are maritime contracts? It has been said that the admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims and services purely maritime, and touching rights and duties appertaining to commerce and navigation. It is clear, says the Supreme Court, in the case last referred to, that a contract for the use of a wharf by the master or owner of a ship or vessel is a maritime contract, and, as such, that it is cognizable in the admiralty; that such a contract, being one made exclusively for the benefit of the ship or vessel, a maritime lien in the case supposed arises in favor of the proprietor of the wharf against the vessel for payment of reasonable and customary charges in that behalf for the use of the wharf, and that the same may be enforced by a proceeding in rem against the vessel, or by suit in personam against the owner. . . . But is there not an essential difference between a claim or demand for wharfage, as understood in the laws and usages of navigation, and a claim for rent as such of a wharf, under a contract that, assuming it to be valid as between the parties, creates the relation of landlord and tenant? Under such contract, the rent is payable, though a vessel should never approach the wharf, or though the wharf may be used for purposes quite foreign to the maritime trade. It could hardly be contended that a contract for building or repairing a wharf is embraced in the class of contracts denominated maritime, any more than it could (and not with as much propriety) be contended that a contract to build a ship is a maritime contract; and it has been expressly held by the Supreme Court of the United States that a contract for building a ship is not of a maritime character, and therefore not within the admiralty jurisdiction. . . . Nor can we suppose that a contract for the sale of a wharf could be regarded as a maritime contract; and if not, why should a lease of a wharf that may be for a long

---

[1]The Court explained that a "dry-dock" is a "fixed structure" that is "contrived for the purpose of taking ships out of the water, in order to repair them, and for no other purpose." *Cope*, 119 U.S. at 627.

> term, with annual rent reserved, and, as may be, with conditions
> and stipulations for repairs or rebuilding the same from time to
> time, be regarded as a maritime contract, and as such cognizable
> only in a court of admiralty?  We are clearly of opinion that the
> lease of a wharf, supposing it valid, is not a maritime contract, in
> any proper sense, but is a contract relating to realty, and must be
> performed on the land.

*Id.* at 56-57 (citations omitted).

Although these cases deal with wharves and dry-docks rather than the operation of a marina, we find them informative to the extent that they suggest a conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure that happens to involve boats.  Simply because a contract involves a marina does not mean it necessarily is a maritime contract.  We must look at the nature of the contract and, in the case of an insurance policy, consider the specific interests insured.  Applying that distinction in this case, we conclude that this insurance policy covering a yacht dealership and a marina falls outside the scope of our maritime jurisdiction, despite the fact that some of the services provided by the marina may relate incidentally to or facilitate maritime commerce.  Like other courts that have addressed similar issues, we also are reluctant "to open the courthouse doors to a surge of litigation concerning transactions that may only tangentially involve a maritime business or a ship owner merely because one is a party in the dispute." *Illinois Constructors Corp. v. Morency & Assoc.*, 794 F. Supp. 841, 843 (N.D. Ill. 1992).[2]  This concern is all the more pressing where, as here, the contract at issue is multifaceted and covers a diverse range of interests, many of which have little bearing on maritime commerce.

---

[2]Notwithstanding this reluctance, the Northern District of Illinois nevertheless held in *Illinois Constructors Corp.* that an agreement to procure marine insurance is a maritime contract because insuring ships at sea "is integral to the maritime activities of the vessel."  794 F. Supp. at 843.

**IV.**

We therefore **REVERSE** the district court's assumption that it has jurisdiction and **VACATE** its analysis of the abstention issue, but **AFFIRM** its judgment dismissing NHIC's claims, although on different grounds.