442 So.2d 1171 (1983)
Glen ALLEN
v.
Cecil M. KEENEY, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, Courtney Pennington, Employees Mutual Liability Insurance Company of Wisconsin, Standard Paint and Varnish Company, Inc., Nolty J. Theriot, Inc. and The Continental Insurance Company.
No. 83 CA 0114.
Court of Appeal of Louisiana, First Circuit.
November 22, 1983.
Rehearing Denied December 22, 1983.
Writ Denied February 27, 1984.
*1173 Thomas W. Thorne, Jr., New Orleans, for Employers National Ins. Co.
W. Frederick Denkman, Stuart McClendon, Metairie, for plaintiff Glen Allen.
Wood Brown, III, New Orleans, for Cecil Keeney, et al.
Jack Alltmont, Robert Redwine, New Orleans, for Equitable Equipment & Equitable Shipyards.
Dominic Gianna and J. Gregg Collins, New Orleans, for Standard Paint & Varnish.
Before LOTTINGER, EDWARDS and ALFORD, JJ.
LOTTINGER, Judge.
This is a suit for personal injuries occurring when plaintiff, Glen Allen, was injured while building a ship over navigable waters. Several defendants were named: Cecil M. Keeney, John R. Tipton, John Pennington, Charles O. Seruntine, Jr., Steve A. Davis, Donald R. Chandler, Fred Martin, Floyd Jenkins, Courtney Pennington, Maurice Toomer, Lee R. Stelly, Robert Mahne, all supervisors or executives of Equitable Equipment Co., Inc. (now Equitable Shipyards, Inc., hereinafter referred to as "Equitable"), pursuant to La.R.S. 23:1101, before amendment; Employer's Mutual Liability Insurance Company of Wisconsin (hereinafter referred to as "Employers Mutual"), liability insurer of Equitable; Standard Paint and Varnish Company, Inc. (hereinafter referred to as "Standard"), manufacturer and supplier of a paint which ignited and resulted in the accident; and Nolty J. Theriot, Inc. and the Continental Insurance Company, the company for whom the ship was being built and its insurer, respectively.
The defendants sought a summary judgment, but were denied. A jury trial was conducted. The trial judge directed a verdict in favor of Nolty J. Theriot, Inc. and its insurer. The jury found only some of Equitable's employees liable (Cecil M. Keeney, John R. Tipton, John Pennington, Charles O. Seruntine, Jr., Steve A. Davis and Maurice Toomer) and therefore also found Equitable's insurer, Employer's Mutual, liable. Standard was found negligent, but the jury determined that its negligence was not a legal cause of the accident. Plaintiff was awarded $750,000.00. A motion for post-trial relief was filed by defendants but was denied.
From the trial court's judgment, which implemented the jury's findings, both plaintiff *1174 and the defendants that were held liable appealed.[1]

FACTS
On October 10, 1975, plaintiff was employed by Equitable as an electrician. Several ocean-going tugs were being built by Equitable for Nolty Theriot, Inc., one of which was "Hull No. 1660." It was lying in navigable waters at the time. On the night before, the interior of Hull No. 1660 had been painted with a product manufactured by Standard. Plaintiff was performing electrical work upon the hull along with several co-workers who were welding and cutting. A sudden explosion ripped through the hull, killing one worker immediately and mortally wounding another. Plaintiff received only minor burns but witnessed the charred and mutilated bodies of his fellow workers; his claimed psychological injuries stem from this observation.

SPECIFICATIONS OF ERROR
The defendants have alleged the following specifications of error:
1) The trial court erred in failing to grant summary judgment against the plaintiff or to give post-trial relief because: a) the Longshoremen's and Harbor Worker's Compensation Act (LHWCA) applies exclusively to this case, the Louisiana Workmen's Compensation Act does not, hence defendants are immune from suit; b) alternatively, should the state act apply, its allowance of suits against co-employees is violative of the uniformity of maritime law; c) there is no right of election of remedies for plaintiff here, but if there is, such election should not bind defendants; and d) alternatively, no election was made by plaintiff;
2) the jury erred in finding that five of the six co-employees held liable were negligent;
3) the jury erred in finding that Standard's negligence was not a legal cause of the accident; and
4) jury's award of $750,000 was excessive.
The plaintiff also appealed, alleging that 1) the jury erred in finding that Standard's paint was not defective and that the paint was not a legal cause of the accident, and 2) the jury erred in finding that Standard's negligence was not a legal cause of the accident.

ISSUES

THE EXCLUSIVITY OF THE LHWCA
Plaintiff brought suit against his co-employees under La.R.S. 23:1101 as it read before its amendment by 1976 La. Acts, No. 147, § 2. Defendants first maintain that the LHWCA applies exclusively to plaintiffs' claim and therefore the present suit is prohibited by that Act. Plaintiffs do not deny that the LHWCA applies, but rather argue that it is not the exclusive remedy.
A review of the history of the LHWCA and the evolution of its concurrent jurisdiction with state compensation laws is unnecessary, since such a review is contained in Director, Office of Worker's Compensation Programs, United States Department of Labor v. Perini North River Associates, ___ U.S. ___, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983) and in our own Supreme Court's decision in Beverly v. Action Marine Services, Inc., 433 So.2d 139 (La.1983).
In the latter case the Supreme Court stated:
"Clearly, there is an area of concurrent federal and state jurisdiction. Although the exact boundaries of this zone are unclear, state law is limited to claims which are `local' in nature. The twilight zone does include `persons such as the decedent who are, as a matter of actual administration, in fact protected under the state compensation act'. (citations omitted) Any doubt should be resolved in *1175 favor of the constitutionality of the state remedy." Beverly v. Action Marine Services, Inc., supra, 433 So.2d at 142.
Therefore the issue is whether plaintiff's injury, occurring on navigable waters, is "maritime but local," and thus falls in the "twilight zone" of concurrent jurisdiction, or whether it is a purely maritime injury governed by the LWCHA alone. Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).
The Louisiana Supreme Court acknowledged in Beverly v. Action Marine Services, Inc., supra, that the question of what type workers' duties and injuries constitute "maritime but local" is a difficult one. In Beverly, the worker was a land-based employee of a company that repaired and cleaned vessels. While cleaning out tanks on a vessel afloat upon navigable waters, the employee died after inhaling toxic fumes. After reviewing several United States Supreme Court cases[2] where parties injured over navigable waters while repairing vessels or working on barges were allowed to elect a state remedy, the Supreme Court decreed that state compensation law could apply to Beverly. The court found those cases indistinguishable from the facts in Beverly.
The court apparently also based the Beverly decision on the fact that LHWCA benefits were unavailable to the claimants therein, citing footnote 18 of Perini.[3] We believe that this statement in Beverly was only added for additional support, and was not meant to be the cornerstone of the decision. As the court stated earlier in the opinion, a state compensation remedy may only apply if it is constitutional in the application, i.e. the injury is not beyond the Jensen line. We do not read footnote 18 of Perini to state otherwise.[4]
The scope of plaintiff's duties here was not deeply explored at trial. Allen testified that at the time of the accident he was a first class electrician at Equitable, having moved up from third class in less than a year. He had been working approximately six weeks upon Hull No. 1660 when the accident occurred. He installed and inspected electrical devices aboard the hull, which is what he was doing on the morning of the explosion. We cannot determine from the record what proportion of time, if any, that Allen spent performing duties ashore.
The present case, however, fits into the "twilight zone" more comfortably than does Beverly. As plaintiff points out, contracts to construct entirely new ships are non-maritime because of their inchoate connection to commerce and navigation, while ship repair contracts are maritime. Thames Towboat Co. v. The Francis McDonald, 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920). In Grant Smith-Porter Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922), a carpenter at work aboard a vessel afloat in navigable waters was injured and was allowed to receive state compensation benefits. The court there reconciled the Rohde decision with Jensen and its progeny thusly:

*1176 "In each of them [the Jensen -type cases] the employment or contract was maritime in nature and the rights and liabilities of the parties were prescribed by general rules of maritime law essential to its proper harmony and uniformity. Here the parties contracted with reference to the state statute; their rights and liabilities had no direct relations to navigation, and the application of the local law cannot materially affect any rules of the sea whose uniformity is essential." Grant Smith-Porter v. Rohde, supra, 257 U.S. at 477, 42 S.Ct. at 158, 66 L.Ed. 321.
We thus find that plaintiff's suit under the Louisiana Workmen's Compensation Law was properly allowed because of its local nature and placement in the "twilight zone."

STATE LAW CONFLICT WITH MARITIME LAW
Defendants next claim that if the state compensation act applies, then "general maritime law" forbids plaintiff from bringing this suit against his co-employees, citing Petition of United States, 367 F.2d 505 (3rd Cir.1965), cert. denied, 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805 (1967) and Foremost Insurance Company v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).
Defendants' argument is unpersuasive. As they admit, the LHWCA applies here.
The LHWCA is Congress' exercise of the constitutional grant of admiralty jurisdiction. Gudmundson v. Cardillo, 126 F.2d 521 (D.C.Cir.1942). Thus, the LHWCA supplants the "general maritime law" in cases where the LHWCA governs. This is evidenced, for example, by the 1972 amendments to the LHWCA which abolished the traditional maritime action for unseaworthiness for persons covered by the act. 33 U.S.C. § 905.
As we stated earlier, this is a case where both the state and federal compensation schemes might apply. Once that is determined, it is improper "to reexamine the question of state-federal conflict with respect to particular provisions of the act." Poche v. Avondale Shipyards, Inc., 339 So.2d 1212, 1221 (La.1976), appeal dismissed 434 U.S. 803, 98 S.Ct. 31, 54 L.Ed.2d 60. That Poche, supra, involved a case where an employee was injured on land we deem to be inconsequential. The LHWCA and our state's compensation law both applied there; the "executive officer" suit allowed under our law but forbidden by the LHWCA was upheld.

PLAINTIFF'S RIGHT OF ELECTION
Defendants argue here that if plaintiff is allowed a right to elect the state compensation remedy over the federal, then that election is unfair to defendants, since federal law (either the LHWCA or general maritime law) would prohibit such a suit.
Poche again negates this contention. It would make little sense to allow a right to elect (as we have done) and then to disallow the application of state law when it conflicted with federal law. Plaintiff can choose the more beneficial remedy when the jurisdiction is concurrent.
Defendants next maintain that plaintiff has failed to elect a remedy. They cite Poche, where one of the plaintiffs on original hearing was dismissed because it was stipulated at trial that he was receiving LHWCA benefits. The court held that this was an election to pursue remedies under the federal compensation statute. On rehearing the court noted that there was no evidence that plaintiff elected to seek LHWCA remedies; there was only evidence that he had accepted payments made pursuant to the LHWCA. The court then remanded the case to the district court to determine whether plaintiff had elected a federal remedy. Several cases were cited to buttress their change of mind: Calbeck v. Travelers Insurance Company, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). Holland v. Harrison Brothers Dry Dock and Repair Yard, Inc., 306 F.2d 369 (5th Cir.1962); Griffin v. Universal Underwriters Insurance Company, 283 So.2d 748 *1177 (La.1973); and Ryder v. Insurance Company of North America, 282 So.2d 771 (La.App. 3rd Cir.1973).
Defendants aver that the action taken by the court in Poche means that a plaintiff must prove that an election was made, and that pursuing a suit through the trial court and appellate courts is insufficient to establish an election.
Defendants are mistaken: a plaintiff, having a choice of remedies, does not have to prove that he elected one of them. Rather, the defendant must prove that a plaintiff has made a binding election of one remedy and thus that plaintiff is denied from pursuing other remedies. As the court in Poche said, the fact that a plaintiff received LHWCA benefits is no evidence that a binding election of remedies was made.
In the present case, a written stipulation in the record indicates that plaintiff received $27,255.10, paid pursuant to the LHWCA by Employers National Insurance Company. This is the only "evidence" that he chose the LHWCA remedies. It cannot be determined that plaintiff made an informed choice to accept federal benefits over state, nor whether if even plaintiff, rather than the insurer, made the initial choice or remedies. See Valdez v. Equitable Equipment Company, Inc., 383 So.2d 1371 (La.App. 4th Cir.1980) and Biondolillo v. Geosource, Inc., 359 So.2d 286 (La. App. 4th Cir.1978). Additionally, we take judicial notice of the fact that plaintiff filed a workmen's compensation suit in state court on October 11, 1976.
As noted above, the plaintiff will not be allowed double recovery; the insurer will be reimbursed for its LHWCA payments from the damage award.
Defendants have failed to prove that plaintiff made a binding election of LHWCA benefits.

LIABILITY OF EQUITABLE'S EMPLOYEES
The defendants-appellants maintain that all of them but Maurice Toomer (and thus also Employers Mutual) were erroneously found liable by the jury.[5]
The night before the accident, a paint crew had applied Standard's paint, 39-W, to a ballast tank on Hull No. 1660. Lee Stelly was the night superintendent; he testified that after the painting was completed around midnight, he put a message in a "safety box" telling of the painting and he put "no hot work" signs in the engine room adjacent to the ballast tank ("no hot work" warns that no welding or torch work is to be done).
Floyd Jenkins, who had dual responsibilities in quality control and in safety, tested the engine room before work started in the morning with an explosimeter, a device designed to register the amount of explosive vapors in the air. Getting a reading of 20%, Jenkins reported this finding to Courtney Pennington, who had been appointed superintendent of painting the day before, and to Maurice Toomer, painting foreman. Toomer admitted being told of the readings by Jenkins. He further stated that it then became his duty to ventilate the area; Toomer said that he told Ray Jenkins to take appropriate action, but Jenkins denied having been told.
Nearly all agreed that what should have been done once the 20% reading was made was to rope off the area and stop any hot work. Ben Mullins, electrical foreman and the plaintiff's immediate superior, testified that no one told him paint fumes were present in the engine room on that morning. The shipfitters were allowed to work in the engine room; after about two hours of hot work a flash fire engulfed two of plaintiff's co-workers.
Defendants-appellants claim that Keeney, Tipton, Davis, Pennington and Seruntine all lacked the "personal fault" required to hold such executive officers liable. See *1178 Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Charles Seruntine, Jr., the assistant safety director, was the highest-ranking safety man permanently assigned to Equitable's shipyard in Madisonville, Louisiana. Though his job duties required that he test newly painted tanks for dangerous fumes before work commenced, it was his practice to arrive at the shipyard around eight o'clock in the morning, long after work had started; he arrived after the explosion on October 10th. Seruntine testified that had he tested the tanks instead of Jenkins, he would have stopped all work in the engine room and roped off the area. By not fulfilling his duty of testing the tank, Seruntine allowed Jenkins, who apparently believed he could not stop work himself because of his lower stature, to test the tank. Thus Seruntine, though delegating some of his authority, was personally at fault for the accident. By his own admission, Seruntine would have prevented the explosion had he gotten to work earlier and tested the tank. The jury's finding here was correct.
John Pennington, Seruntine's superior, was the safety director for Equitable's yards in Madisonville and New Orleans. He was at the New Orleans yard at the time of the explosion. There was evidence that he was aware of Seruntine's habitual tardiness which prevented Seruntine from fulfilling his duties. Additionally Pennington was remiss in not adequately explaining to Jenkins his role as "designated competent person." Jenkins thought he had to report such a dangerous condition to the involved foreman (the proper procedure under Equitable's safety manual), whereas Pennington said that Jenkins could have immediately stopped all hot work himself "whether he knew it or not."
Steve Davis, the "wet dock" manager, was supervisor of the construction of Hull No. 1660. He testified that he was told of the 20% reading on board the ship. Nevertheless, he ordered the shipfitting crews to work in the engine room but to stay clear of the manhole leading into the newly painted ballast tank. He said these orders were justifiable because of Standard's representations to him that its 39W paint would not catch fire or explode. Nearly all other witnesses, including the other defendants, stated that such a "hot reading" would call for an immediate cessation of all hot work no matter what paint was used. The jury's findings here were not clearly erroneous.
John Tipton, vice president of Equitable, and Cecil Keeney, president of the company, were not shown to have breached a duty to plaintiff so as to support findings of personal fault. Each of them had delegated to subordinates the responsibility of carrying out the safety program. Though plaintiff tried to paint a picture of a company policy where production takes precedence over safety, plaintiff was unable to link Keeney and Tipton personally with the accident and its causes. The jury's findings as to Keeney and Tipton, therefore, are manifestly erroneous or clearly wrong.

LIABILITY OF STANDARD PAINT
Both plaintiff and defendants-appellants argue that the jury erred in exonerating Standard, the manufacturer and seller of the paint that exploded.
The product, 39W, was found by the jury not to be defective so as to be unreasonably dangerous to normal use. See Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971).
The case against Standard and its product was made on three fronts. First, Standard furnished Equitable with two separate documents regarding the 39W paint. The "Material Safety Data Sheet" was blank under the heading "flash point." The flash point is the temperature which the vapors must reach to catch fire. The flash point is listed as 105 degrees Fahrenheit on the "Technical Data" sheet. Thus, some safety people who only read the safety sheet could have been unaware of the flash point.
*1179 Secondly, neither document lists ethyl alcohol as a solvent in 39W; only mineral spirits is listed as such in the safety sheet. The formula for the product shows that a small amount of ethyl alcohol was used as a solvent in 39W. The amount of alcohol that was sprayed in the ballast tank was estimated to be three and a half ounces. The plaintiff's expert testified that the amount greatly increased the flammability of the vapors in the tank; the defendant's expert testified that this small amount of alcohol would have little or no effect.
Lastly, plaintiff and defendant-appellants claim that some of Standard's salesmen misled Equitable into believing that 39W would not catch fire or explode.
The jury, in absolving Standard, could have placed weight on John Pennington's (the safety director for Equitable) testimony that the proper procedure once a dangerous reading on the explosimeter was obtained was to stop work and ventilate the area using forced air and suction hoses, no matter what any data sheet might say. This was buttressed by other Equitable employees who stated that all paints used at the shipyard were thought to be potentially explosive; the 20% reading on Jenkins' explosimeter was uniformly regarded as dangerous, demanding an immediate shut-down of work. Thus, the jury could have reasonably determined that even if Standard was at fault for not including the flash point of 39W on the safety data sheet, or for not listing ethyl alcohol as an ingredient, Equitable's employees bear sole responsibility for the accident.
Finally, Standard's employees testified that no representations that 39W was not flammable were made to Equitable employees; rather, 39W was described as a paint that would not burn once it had dried when welding work was done on surfaces where it was applied.
Thus, the jury's findings here are not clearly erroneous. There is support for not finding 39W unreasonably dangerous and for finding Standard's "negligence" (in not including the flash point on the safety sheet or ethyl alcohol on either sheet) not to have been a cause-in-fact of the accident.

QUANTUM OF DAMAGES
Defendants-appellants claim that the jury's award to plaintiff of $750,000.00 was excessive.
At the time of the accident Glen Allen was 30 years old and married with two children. Prior to working at Equitable, Allen had held jobs with several companies as an electrician. His immediate superior at Equitable testified that Allen was a dependable worker who "was more advanced than other people in my crew that I had."
As a result of the explosion, Allen received minor burns which were shortly healed. Two of his co-workers died, however. Allen testified that he witnessed in great detail the horrible disfigurement and extreme agony of the two men.
Allen immediately began to exhibit signs of mental damage. He became depressed, anxious and unable to eat or sleep or to return to work. He was hospitalized at Touro Infirmary when suicidal tendencies were displayed.
His treating physician at Touro was Dr. Charles Smith. He testified that Allen exhibited signs of severe post-traumatic stress disorder which were in all probability a result of the accident. Dr. Duane Burgess treated Allen for over five years. He described in detail Allen's medical history during that time. Allen's depression and fears necessitated prescriptions of several tranquilizers and anti-depressant drugs, without which Allen could not function, in his opinion. Allen had to be hospitalized several times during that period for more intensive treatment. He continues to take strong medications and will likely need to continue doing so indefinitely.
From the time of the accident in 1975 until the trial in 1982, plaintiff had not worked at any paying job. Several attempts to return to work ended in frustration when Allen proved incapable of overcoming the paralyzing fear which rendered him incompetent to perform simple tasks, *1180 concentrate, or to assume any responsibility. Dr. Burgess, along with Dr. Pitzler, a psychologist who performed tests upon the plaintiff, both stated that Allen was suffering from chronic post-traumatic stress disorder; both thought there was little or no chance that his condition would improve in the future.
Plaintiff also complained that he experiences nightmares three or four times a week. Migraine headaches occur at the same rate. He has had stomach problems resulting in ulcers. His appetite has shrunk considerably, and he cannot eat meat because it reminds him of his charred co-workers.
There was evidence that plaintiff's past medical expenses were $24,041.44. Future medical expenses, as testified to by plaintiff's economist based upon the treating physician's prognosis, was calculated to be $166,425.00. The economist estimated plaintiff's past lost wages to be $108,501.00; his future lost wages, including employee fringe benefits offered by most employers, well put at $584,284.00. The past wages were calculated on the basis of Allen's last tax return; the future lost wages were calculated by using a work-life expectancy of 25 years, a 6½ inflation rate and a 7½ discount rate and periodic pay raises; a permanent disability was of course assumed.
Thus on the basis of credible evidence the jury was presented with possible special damages alone of $883,251.00. That the total award given by the jury was only $750,000.00, which may have included an award for past and future pain and suffering, indicates an award within the "much discretion" allowed the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Therefore, the judgment of the trial court is reversed only insofar as it found Cecil Keeney and John Tipton liable, and in all other respects, the judgment of the trial court is affirmed, with appellants to pay all costs both in this court and in the trial court.
REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[1] Several third-party claims were filed by the various defendants; all were dismissed and none were appealed. Employers National Insurance Company intervened to recover $27,255.10 paid by it to plaintiff, which represented payments under the Longshoremen's and Harbor Worker's Compensation Act; judgment was rendered awarding intervenor that amount.
[2] Hahn v. Ross Island Sand & Gravel Co., 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959); Moore's Case, 323 Mass. 162, 80 N.E.2d 478 (1948); affirmed in Bethlehem Steel Co. v. Moore, 335 U.S. 874, 69 S.Ct. 239, 93 L.Ed. 417 (1948); Baskin v. Industrial Accident Commission, 89 Cal.App.2d 632, 201 P.2d 549 (1949), remanded in Baskin v. Industrial Accident Commission, 338 U.S. 854, 70 S.Ct. 99, 94 L.Ed. 523 (1949).
[3] Footnote 18 of Perini, as quoted in Beverly, states:

"[B]oth state and federal remedies are available to injured workers, ... employers with employees working on the shore would have to contribute to state compensation funds in the event that an employee covered by LHWCA's shoreside extension sought state compensation, or an employee was deemed for whatever reason not to be eligible for LHWCA relief." Director, Etc. v. Perini North River Associates, supra, ___ U.S. ___, 103 S.Ct. at 643, 74 L.Ed.2d at 475. (Emphasis added) Beverly v. Action Marine, supra 433 So.2d at 141.
[4] Plaintiff mentions in passing that he has no right at present to assert a claim under the LHWCA. He has not shown this to be so. We do not feel the possible availability to LHWCA benefits to plaintiff distinguishes the case from Beverly, however, as just stated.
[5] By conceding Toomer's liability, Employers Mutual remains liable for the whole judgment. In the event we find the other defendants-appellants blameless and Standard liable, Employers Mutual would then ultimately bear a lesser proportion of the judgment.