449 So.2d 81 (1984)
Debbie QUAVE, et al.
v.
Curtis BARDWELL.
No. 83 CA 0445.
Court of Appeal of Louisiana, First Circuit.
April 3, 1984.
Maurice Robinson, Jr., Hammond, for plaintiffs-appellees.
Richard C. Macaluso, Hammond, for defendant-appellant.
*82 Before LOTTINGER, EDWARDS and ALFORD, JJ.
ALFORD, Judge.
Plaintiff-appellee, Debbie Quave, filed this suit against defendant-appellant, Curtis Bardwell, seeking damages for the deliberate and unjustified killing of her german shepherd dog, Kilo Bandito. After a trial on the merits, the lower court awarded judgment in favor of appellee.[1] Appellee was awarded $2,500.00 in damages and appellant was also ordered to pay a $120.50 medical bill incurred by Quave. Bardwell was taxed with all costs.
On appeal, the appellant has raised six specifications which will be grouped into four general areas for review. First, however, we will consider the relevant facts of record.
Sometime around eleven o'clock p.m. on September 28, 1979, Debbie Quave left her home with Ronnie King, her live-in boy friend, in order to drive King to work. At approximately the same time, Curtis Bardwell was coming home for the night to his mother's house where he was staying. Testimony revealed that appellee and appellant lived two houses away from each other.
Bardwell testified that a short period after falling asleep he was awakened by the sound of fighting or barking dogs. Appellant owned a female dog who was in heat and he assumed the dogs were fighting over her. Grabbing his twenty gauge shotgun, Bardwell walked to the door to allegedly scare the dogs off. Opening the door, which led to a covered carport, Bardwell testified that he saw a large german shepherd a few feet to his right. Allegedly fearing an attack, the appellant leveled his shotgun at the dog and shot Kilo at close range. When asked whether the light in the carport was burning, Bardwell could not remember, but he did assert that it was dark. After firing the shot, appellant testified the dog ran away yelping.
Around 6:30 a.m. that same morning, the appellee arrived home after driving King to work. Discovering Kilo lying motionless with a hole in his face, Quave opened the gate to her fenced-in yard and, after struggling to his feet, Kilo went through the gate and underneath the house. The appellee immediately called Kilo's veterinarian, Dr. Glenn Hutchinson, who rushed to Quave's house to treat the animal. After administering a sedative, Hutchinson was able to get Kilo to his clinic for emergency surgery. Kilo died sometime that night.
At the conclusion of the trial, the judge noted his impressions of the evidence from the bench. The trial judge said it was his opinion that the shooting of Kilo,
... was a completely unprovoked act and intentional action by the defendant. [The trial judge continued...] I don't think he [Bardwell] had any justification or excuse, I don't feel that he was threatened by the dog in any way. There has been no evidence whatsoever introduced in this case to prove any vicious or dangerous propensities of the dog. I feel he was completely unjustified in the killing of the dog.
In findings of fact filed in the record, the lower court held that the,
Defendant did willfully, maliciously and without cause shoot and kill the German Shepherd dog named Kilo Bandito....
Finding no abuse of discretion in this decision, we affirm at appellant's costs. The appellant cites four general areas on appeal that he thinks merit a reversal. We shall review these separately.
First, appellant argues that appellee failed to prove that the shooting of Kilo was unjustified and not an act of self-defense. Whether the killing was or was not justified is a factual determination which must be decided on the relevant evidence presented at trial.
A reading of the transcript suggest a two-pronged analysis into the sufficiency *83 of the evidence: What does the testimony demonstrate as far as the demeanor and behavioral characteristics of Kilo; and what does the testimony demonstrate as far as the demeanor and behavioral characteristics of Bardwell? The evidence presented at trial was incontrovertible that Kilo was a dog of gentle and friendly demeanor, and although he was a german shepherd, Dr. Hutchinson testified that Kilo was only approximately 75 pounds, which we do not find very large for a shepherd. Ronnie King, who lived with Debbie Quave (and Kilo), testified Kilo was "just like a baby" and never attacked anyone. A close neighbor of appellant and appellee, Henry Baudoin, testified that Kilo never barked at him and that he (Baudoin) would frequently play with Kilo when Kilo was inside the fence. Freddie Manchac, III testified that Kilo was very gentle with Manchac's little boy, and that he never saw Kilo growl or exhibit any vicious tendencies. In fact, Manchac testified that quite often his little boy would get on Kilo's back and go for a ride. When Kilo or the boy tired of that, they would lay down and play in the grass. Indeed, because of Kilo's amiable behavior, Manchac would often remark to Quave that Kilo was "too friendly to be a german shepherd". Additionally, Bryan Stanga, a former neighbor of the litigants, testified that Kilo was not vicious, and in fact, was always friendly. Furthermore, Mr. Stanga testified on direct examination:
Q. What was your experience with the dog?
A. Well, the first time I went there, when they had the dog, you know, I saw it was a big dog and when I come up to the gate, you know, it was just a big dog, wagging its tail, so I knewI had no fear of the dog at all from the first sight.
Q. Did he bark at you?
A. No, didn't even bark, just kind of wagged his tail and come up to the gate.
On cross-examination by appellant, Dr. Hutchinson testified that an unaltered male dog may exhibit some aggressive tendencies around a female dog in heat, but that he could not be absolutely certain on this point. However, on re-direct examination, Dr. Hutchinson asserted that simply because a male dog's otherwise gentle demeanor may change around a female dog in heat, this did not, ipso facto, mean that an otherwise mild-mannered dog would always exhibit a change of personality. In the veterinarian's view, whether a dog's personality would change around a female dog in heat was an open question to which he could not provide a definitive or expert opinion.
Lastly, Debbie Quave testified that Kilo was a very gentle dog who never got in fights with other dogs or people. Indeed, appellant testified that Kilo was not used for a watchdog and that she depended upon her other dog, a St. Bernard, for protection. Thus, the evidence in the record is overwhelming that, while Kilo was a german shepherd, nevertheless, he exhibited a very gentle and friendly disposition around children, adults, and other dogs.
On the other hand, Bardwell's attitude towards dogs can be characterized as nothing short of vicious and brutal. For example, Bryan Stanga, who was 23 at the time of the trial, stated he has known the appellant since Stanga was fourteen or fifteen. On direct, Stanga answered questions about an incident in 1976 when he was riding in a vehicle with Bardwell:
Q. Were you ever in the company of Mr. Curtis Bardwell when he killed a dog?
. . . .
A. Uh, I was with him in a vehicle and we was going down Wadesboro Road, it was a pickup truck and, you know, there was a dog sitting in this long driveway of a little store and I remember the dog not even facing the road and Curtis leaving the road to run over the dog and it sticks in my mind clear, you know, because I always remember looking back and seeing that dog coming out from under the truck, you know, that wasit was on purpose he *84 left the road and even said, you know, watch me get this dog, you know.
On cross-examination, Bardwell admitted to a conviction of cruelty to animals two days prior to the incident in question. In this instance, he killed a dog belonging to Henry Baudoin. Testimony revealed that Baudoin's dog was small and not threatening Bardwell in any way. Apparently, appellant went out of his way to slaughter the small dog; after firing ten to fifteen .22 caliber rifle shots into the crippled animal, Bardwell followed the dog into some bushes where it had apparently gone to die and then finished the animal off at close range.
Furthermore, and again on cross-examination, Bardwell was asked:
Q. Have you ever killed any other dogs other than the one we are talking about this morning and the one that belonged to Mr. Boudoin (sic)?
. . . .
A. Uh, I killedyes.
Q. Have you killed them with guns also or
A. Yes sir.
Q. You killed them because they were attacking you?
A. No sir.
Thus, a pertinent and revealing character trait of the appellant is exemplified by this testimony: Bardwell has no qualms about shooting dogs even though they are not attacking him.
Mr. Bardwell testified that he grabbed his shotgun because he wanted to scare the barking dogs off. Appellant testified that he was merely going to shoot in the air, but that when he saw Kilo he leveled his aim and shot Kilo at close range. Beside the fact that using a shotgun to frighten barking dogs may be overkill in our opinion, we also find interesting the observation made by the trial judge that if Bardwell really did intend merely to shoot in the air, he would have shot off the roof of the carport!
There are other inconsistencies in appellant's testimony that we need not address here. Suffice it to say that the above detailed analysis proves that the trial judge's factual conclusion that the shooting of Kilo was unprovoked and intentional is clearly supported by the record. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Pearce v. Rogers, 423 So.2d 83 (La. App. 1st Cir.1982). Appellant's argument otherwise is rejected.
Appellant next argues that the trial judge's award of $2,500.00 was unsupported by the evidence, and that the lower court committed error when it found that the appellee had used Kilo for breeding purposes. First, we note that Quave paid $200.00 for Kilo and he was approximately three and a half when he was killed. Testimony revealed that Kilo was registered with the American Kennel Club. Clearly, the value of Kilo for stud purposes was significant. Indeed, Quave testified that she had loaned Kilo three times for breeding purposes. Once to Timmie Jones in Baton Rouge for $100.00, and twice to Freddie Manchac for a total of $200.00. Freddie Manchac confirmed Quave's testimony in this respect. Thus, because of the shooting of Kilo, Quave lost her original investment, her expenses incurred in taking care of Kilo until he was killed, the money she could have made with Kilo at stud, and additionally, she is faced with replacement costs should she choose to buy another dog. Given the difficulties involved in obtaining an exact measure of damages, if indeed one is at all possible, we do not think the trial court abused the much discretion afforded it when determining damages. Reck v. Stevens, 373 So.2d 498 (La.1979); Allen v. Keeney, 442 So.2d 1171 (La.App. 1st Cir.1983), citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). Appellant's assertion otherwise is rejected.
The next issue presented for our review is appellant's assertion that it was error for the trial judge to consider evidence of irrelevant and immaterial acts of Bardwell. It must be remembered that this was a civil action brought by the plaintiff to recover damages; it was tried by a judge without a jury.
*85 On cross-examination Bardwell was asked about the prior conviction for cruelty to animals. After he admitted the crime, Quave attempted to elicit additional details of the crime but appellant objected. The objection was sustained by the trial judge. The appellee then asked Bardwell whether he ever killed any other dogs and appellant objected on the grounds of relevancy. The objection was overruled. Next, when appellee attempted to question Ronnie King about the incident with Mr. Baudoin's dog (the incident giving rise to the conviction), appellant again objected on grounds of relevancy. Again the objection was over-ruled. Finally, appellant's objection on the grounds of irrelevancy was over-ruled when Bryan Stanga gave testimony regarding the incident when Bardwell intentionally and without reason ran over a dog with his truck.
Although the following statutes are in Title 15, "Criminal Procedure", they are helpful in shedding light on the present issue before us for review. LSA-R.S. 15 § 441 provides: "Relevant evidence is that tending to show the commission of the offense and the intent..." (emphasis supplied). Additionally, LSA-R.S. 15 §§ 445 and 446 provide in pertinent part:
In order to show intent, evidence is admissible of similar acts, independent of the act charged....
When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declaration of the accused as tend to establish such knowledge or intent....
Whether or not Bardwell shot Kilo without cause was, essentially, a question of intent, and the evidence appellee presented in this respect was quite relevant. The trial judge's determination that the evidence was relevant is supported by the record and will not be disturbed on appeal. City of Baton Rouge v. Tullier, 401 So.2d 422 (La.App. 1st Cir.1981), writ denied, 406 So.2d 605 (La.1981).
The final issue for our review causes some confusion. Appellant's specification of error number six provides:
The trial court erred in finding that the plaintiff had stated a cause of action and/or a right of action. These issues were raised in the responsi-(sic) pleading styled "First Supplemental and Amending Answer" and the plaintiff did not meet her burden of proof in showing that her animal was entitled to the protection of law.
In fact, there is no pleading styled "First Supplemental and Amending Answer" in the record, nor is there an exception of no cause of action or no right of action in the record. Indeed, the transcript is completely devoid of any evidence relevant to the disposition of this particular issue. Our review of the record indicates that this specification of error is meritless.
For the above reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] Debbie Quave's boyfriend, Ronnie King, also joined in the suit as a plaintiff. Finding he was not the true owner of Kilo, the trial judge dismissed King's claim; King has not appealed this ruling.