109 F.3d 105
 1997 A.M.C. 1772, 37 Fed.R.Serv.3d 531
 TRANSATLANTIC MARINE CLAIMS AGENCY, INC., a/s/o Daewoo
Automotive Components, Ltd., Plaintiff-Appellee,
M/V Hyundai Emperor, etc. her engines, boilers, etc., Defendant,
Hyundai Merchant Marine, Defendant,
Burlington Northern Railroad, Defendant,
Conrail, Defendant,
v.
ACE SHIPPING CORP., DIVISION OF ACE YOUNG INC., Defendant-Appellant.
 No. 826, Docket 96-7583.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 8, 1997.
Decided March 13, 1997.
 
 James F. Campise, Marcigliano & Campise, New York City, for Plaintiff-Appellee.
 Stephen A. Frank, Badiak Will & Maloof, New York City, for Defendant-Appellant.
 Before NEWMAN, Chief Judge, McLAUGHLIN, Circuit Judge; and SAND, District Judge*
 McLAUGHLIN, Circuit Judge:
 
 Background
 
 1
 In March 1994, Daewoo Automotive Components, Ltd. ("Daewoo") hired defendant-appellant Ace Shipping Corp. ("Ace") to transport automobile parts from New York to Pusan, Korea. Daewoo and Ace executed six bills of lading (which are simply contracts of carriage) calling for transportation of the parts from New York, through Seattle, to Pusan.
 
 
 2
 Ace is a non-vessel-owning common carrier ("NVOCC"), which means that it arranges for the shipment of cargo, but does not itself own a ship. Ace accepted Daewoo's relatively small cargo, consolidated it with cargo from other customers, and placed the whole load in a "container"--a boxcar-sized storage unit that can be carried by trucks, trains or ships. Ace delivered the container to Hyundai Intermodal, Inc. ("Hyundai"), which, in turn, conveyed it to Burlington Northern Railroad Co. ("Burlington Northern") for transport by rail from New York to Seattle. The train carrying the cargo derailed in Montana. Most of Daewoo's automobile parts were damaged; some were totally destroyed.
 
 
 3
 The loss was covered by insurance and the cargo underwriter paid Daewoo. On March 21, 1995, plaintiff-appellee Transatlantic Marine Claims Agency ("Transatlantic"), an agent for the cargo underwriter, brought this action as a subrogee of Daewoo, naming Ace, Hyundai, Burlington Northern, and Conrail as defendants. On April 10, 1995, Ace signed a waiver of service, acknowledging that it had received a copy of Transatlantic's complaint, and that it recognized its obligation to file an answer or a motion. Ace, however, failed to file an answer or a motion, failed to attend an initial pre-trial conference on July 21, 1995, and ignored a letter (apparently sent as a professional courtesy) from Transatlantic warning Ace that it would be subject to a default judgment if it did not appear in the action.
 
 
 4
 On August 18, 1995, Transatlantic filed a motion--on notice to Ace--to enter a default judgment against Ace. Ace again failed to respond, and on October 25, 1995, the District Court entered a default judgment for $51,753.86 (the amount Transatlantic sought in its complaint--$45,976.83--plus interest and costs). Transatlantic entered into a stipulation with the remaining defendants, discontinuing its case against them.
 
 
 5
 On March 7, 1996, Ace finally reacted by filing a motion to vacate the default judgment. Ace argued that because its principals are Korean, unfamiliar with our legal system, its failure to appear should be deemed "excusable neglect" under Federal Rule of Civil Procedure 60(b)(1). The District Court denied Ace's motion and Ace filed a timely notice of appeal.
 
 
 6
 On appeal, Ace now abandons its claim of "excusable neglect," and asks us, instead, to vacate the default judgment for lack of subject matter jurisdiction. See Fed.R.Civ.P. 60(b)(4) and 12(h)(3). Transatlantic vigorously disputes this contention.
 
 
 7
 In its complaint, Transatlantic invoked only admiralty jurisdiction (probably because the $50,000 amount in controversy requirement for diversity jurisdiction was not satisfied). Transatlantic attached to its complaint a document entitled "Schedule B" (purportedly based on the bills of lading themselves) which imparted the following information about the transport of Daewoo's automobile parts:
 
 
 8
 ** This appears to be a peculiarly British spelling of Pusan, a place of unhappy memory to many Americans of a certain age.
 
 
 9
 Vessel: HYUNDAI EMPEROR
 Place to Delivery to First Carrier: NEW YORK
 Intended Port of Shipment: Seattle
 Intended Port of Discharge: Pusan,** Korea
 
 
 10
 ** This appears to be a peculiarly British spelling of Pusan, a place of unhappy memory to many Americans of a certain age.
 
 
 11
 On appeal, the parties have submitted copies of the actual bills of lading, listing the following information:
 
 
 12
 Pier: NEW YORK
 Ocean Vessel: HD EMPEROR V. 14
 Port of Loading: SEATTLE
 Port of Discharge: PUSAN, KOREA
 For Transshipment to: [BLANK]
 Onward Inland Routing: [BLANK]
 Place of Delivery: CFS PUSAN
 
 
 13
 While it is clear that Daewoo and Ace agreed that the parts would journey from New York to Seattle to Pusan, nothing in the record addresses whether the first leg of the trip, from New York to Seattle, would be by train or by ship. Again, the derailment occurred in Montana, and this appeal requires us to determine whether there is admiralty jurisdiction in this somewhat peculiar situation.
 
 Discussion
 
 14
 A. Papers and Evidence to be Considered.
 
 
 15
 It is undisputed that the issue of subject matter jurisdiction was never raised before the District Court. This, however, poses no obstacle because "[t]he failure of the parties to contest the district court's authority to hear a case 'does not act to confer [federal] jurisdiction ... since a challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] sua sponte ' " at any time. United Food & Commercial Workers Union, Local 919 v. CenterMark Properties, 30 F.3d 298, 301 (2d Cir.1994) (quoting Alliance of Am. Insurers v. Cuomo, 854 F.2d 591, 605 (2d Cir.1988)); Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); see generally 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350.
 
 
 16
 Ace argues that in deciding whether there is subject matter jurisdiction, we must examine only Transatlantic's complaint. Hence, runs the argument, we cannot consider the bills of lading because they were not included in the record before the District Court, and are introduced for the first time on appeal. Ace advances two arguments to support this contention.
 
 
 17
 First, Ace suggests that its challenge to jurisdiction is a "facial challenge," viz., that the "jurisdictional allegations of the complaint are insufficient on their face to demonstrate the existence of subject-matter jurisdiction." Therefore, Ace concludes, our review is confined to the allegations of the complaint.
 
 
 18
 Ace relies on an Eighth Circuit case, Osborn v. United States, 918 F.2d 724, 729 n. 6 (8th Cir.1990), which does indeed make a distinction between a "facial attack" on jurisdiction--which challenges only whether jurisdiction is sufficiently pled--and a "factual attack"--which looks beyond the pleadings and challenges the factual basis of jurisdiction. Osborn, however, does not compel us to make a choice between the two approaches.
 
 
 19
 Even if Ace challenges only the sufficiency of Transatlantic's complaint, we are entitled at any time sua sponte to delve into the issue of whether there is a factual basis to support the District Court's exercise of subject matter jurisdiction. See Maryland Cas. Co. v. W.R. Grace and Co., 23 F.3d 617, 621 (2d Cir.1993); United States v. Burmah Oil Co., Ltd., 558 F.2d 43, 46 (2d Cir.1977); Bernstein v. Universal Pictures, Inc., 517 F.2d 976, 979 (2d Cir.1975). In so doing, the case law does not limit our right to refer to any material in the record. See Land v. Dollar, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 1011 & n. 4, 91 L.Ed. 1209 (1947); United Food & Commercial Workers Union, Local 919 v. CenterMark Properties, 30 F.3d 298, 303, 305 (2d Cir.1994); Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir.1991) ("[o]n a motion ... challenging jurisdiction the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings") vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); see generally 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350.
 
 
 20
 Second, at argument, Ace maintained that we particularly cannot examine the bills of lading because "in default, the plaintiff is limited to its pleadings." It is, of course, ancient learning that a default judgment deems all the well-pleaded allegations in the pleadings to be admitted. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir.1992); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69-70 (2d Cir.), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). This principle, however, has no bearing on an inquiry into whether the default judgment itself is void for lack of subject matter jurisdiction.
 
 
 21
 B. Admiralty Jurisdiction.
 
 
 22
 Turning to the fundamental question whether this case falls within admiralty jurisdiction, we start by noting that the injury to Transatlantic (as Daewoo's subrogee) occurred on land--in Montana--where the train carrying the parts derailed. Conceivably, this injury could still fall within admiralty jurisdiction as: (1) an admiralty tort (negligence); or (2) a breach of an admiralty contract.
 
 
 23
 1. Tort.
 
 
 24
 We conclude that this case does not fall within admiralty tort jurisdiction. The Supreme Court, in Foremost Ins. Co. v. Richardson, 457 U.S. 668, 673-74, 102 S.Ct. 2654, 2657-58, 73 L.Ed.2d 300 (1982), and again in Sisson v. Ruby, 497 U.S. 358, 364, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990), has emphasized that all admiralty torts must have "a substantial relationship to traditional maritime activity." An important--although not necessarily determinative--consideration in ascertaining whether such a "relationship" exists is whether the tort occurred on navigable waters. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, ----, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995).
 
 
 25
 Under these standards, it is clear that since the incident at issue in the instant case occurred solely on land--as the result of a train derailment having no relationship whatsoever to admiralty activity--admiralty tort jurisdiction does not lie. See Jerome B. Grubart, Inc., 513 U.S. at ----, 115 S.Ct. at 1048 ("a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity") (citations omitted) (internal quotations omitted); J. Lauritzen A/S v. Dashwood Shipping, Ltd., 65 F.3d 139, 142 (9th Cir.1995).
 
 
 26
 2. Contract.
 
 
 27
 When assessing admiralty contract jurisdiction, "the 'nature and subject matter' of the contract at issue [is] the crucial consideration." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 611, 111 S.Ct. 2071, 2076, 114 L.Ed.2d 649 (1991). The general rule is that admiralty jurisdiction arises only when the subject-matter of the contract is "purely" or "wholly" maritime in nature. See Rea v. The Eclipse, 135 U.S. 599, 608, 10 S.Ct. 873, 876, 34 L.Ed. 269 (1890); Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd., 968 F.2d 196, 199 (2d Cir.1992); The Ada, 250 F. 194, 196 (2d Cir.1918). A "mixed" contract, i.e., a contract that contains both admiralty and non-admiralty obligations is, therefore, usually not within admiralty jurisdiction. Atlantic Mutual, 968 F.2d at 199; Compagnie Francaise v. Bonnasse, 19 F.2d 777, 779 (2d Cir.1927); Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 880 (3d Cir.1992) [hereinafter Berkshire ].
 
 
 28
 We must determine therefore, whether Daewoo and Ace, at the time they executed the bills of lading, contemplated that the automobile parts would travel from New York to Seattle by rail, or by ship. If the former, then the contract is "mixed," and not within admiralty jurisdiction. If the latter, then the contract is wholly maritime, and within admiralty jurisdiction. We stress that the question is not how the goods were actually transported (or, more accurately, attempted to be transported) from New York to Seattle but what the parties intended or at least expected when they executed the bills of lading. Berkshire, 954 F.2d at 881.
 
 
 29
 We are aware that there are two exceptions to the general rule that "mixed" contracts fall outside admiralty jurisdiction. Assuming, arguendo, that the bills of lading are "mixed" contracts, those exceptions clearly do not pertain to this case. They apply only when the non-maritime portion of a "mixed" contract is either (1) severable from the maritime obligations or (2) "merely incidental" to the maritime obligations. See Sirius Ins. Co. v. Collins, 16 F.3d 34, 36 (2d Cir.1994); Atlantic Mutual, 968 F.2d at 199 ("The extensive cross-United States transport of the goods would not be an 'incidental' aspect of the contract."); Berkshire, 954 F.2d at 881; New York Marine & Gen'l Ins. Co. v. S/S Ming Prosperity, 920 F.Supp. 416, 420 (S.D.N.Y.1996) (transportation from coast to coast across the United States may not be considered incidental).
 
 
 30
 The question whether the contract between Daewoo and Ace (assuming that it is a mixed contract) is severable is irrelevant in this case because the loss undoubtedly occurred during nonmaritime activity, and we could not exercise admiralty jurisdiction over that portion of a "mixed" contract. See New York Marine, 920 F.Supp. at 420 ("severability of the nonmaritime portion [is] impossible where 'the loss occurred during the non-maritime leg of the journey' ").
 
 
 31
 The mode of transportation from New York to Seattle that was contemplated by the parties remains the core of this case. In determining whether the parties contemplated a train trip, which would defeat admiralty jurisdiction, we turn first to the face of the bills of lading:
 
 
 32
 Pier: NEW YORK
 Ocean Vessel: HD EMPEROR V. 14
 Port of Loading: SEATTLE
 Port of Discharge: PUSAN, KOREA
 For Transshipment to: [BLANK]
 Onward Inland Routing: [BLANK]
 Place of Delivery: CFS PUSAN
 
 
 33
 The bills, as we noted above, are unenlightening as to how the goods would travel from New York to Seattle. On the one hand, the fact that New York is designated as the "pier," and that the designation "onward inland routing" is left blank, would seem to indicate that the parties intended the goods to go by ship from New York to Seattle. On the other hand, the fact that Seattle--not New York--is designated the "port of loading," and that the shortest sea route from New York to Seattle is a circuitous course through the Panama Canal, would suggest that the parties anticipated that the goods would be transported by rail from New York to Seattle.
 
 
 34
 In Berkshire, the Third Circuit faced a strikingly similar dilemma. A Taiwanese corporation contracted (via a bill of lading) to have a freight forwarder transport several hundred cartons of umbrellas from Taiwan to New York. "The Bill of Lading ... described in general terms how the goods would travel from Taiwan to New York, but not specifically. While the Bill stated that the goods would be loaded onto the ship M.V. Hakusan II at Keelung, Taiwan ... and that the place of delivery was New York, it did not specify the means of transporting the containers between these two ports. The Bill neither provided that the Hakusan II would transport the umbrellas all the way to New York, nor did it specifically mention land transport." Berkshire, 954 F.2d at 878.
 
 
 35
 Finding that the bill of lading was ambiguous, the Berkshire court remanded the case to the District Court. The Third Circuit directed the District Court to take evidence on whether the course of dealing between the parties, and customary practice in the industry, involved shipping goods from Taiwan to Los Angeles, and then completing the trip cross-country via rail to New York. Only from such evidence, the Third Circuit concluded, could it be determined "whether, in executing the initial Bill of Lading, the parties entertained a reasonable expectation of only maritime transport of the umbrellas." Berkshire, 954 F.2d at 885.
 
 
 36
 Much the same can be said of the instant case. Additional fact-finding in this case may reveal, for example, that the designation of New York as a "pier," does not actually imply that the goods will be put on a ship in New York. It may be that the practice in the industry is to use large industrial areas such as piers to load and maneuver the large containers that are used both in rail and ocean transportation. It is possible that the goods were delivered to the pier but were to be placed in a container at the pier and the container then put on a train.
 
 
 37
 It is also possible that designating Seattle as the "port of loading" does not mean that the goods could not have traveled to Seattle "loaded" on a different ship. The term may refer only to "loading" on the ship that will take the goods to their ultimate destination, or on which the goods will travel the greatest distance.
 
 
 38
 It may also be that, despite the length of the route, it made economic sense for Ace to arrange for the parts to be shipped through the Panama Canal. Fact-finding may reveal that Ace had other customers who needed to ship goods through the Panama Canal, and that by consolidating Daewoo's cargo with these other customers, Ace could obtain a discount rate for the journey.
 
 
 39
 We must, therefore, remand this case to the District Court for a determination as to whether the parties contemplated a mixed contract or a purely maritime route. If the District Court finds that the parties contemplated a mixed contract, and that, therefore, admiralty jurisdiction is not present, it must, of course, dismiss the case. In a letter to this court, Ace represents that, if there is such a dismissal, it will waive the statute of limitations defense to any subsequent action brought by Transatlantic in state court within six months from the date of the dismissal order. We express no opinion as to whether the other defendants could successfully invoke the statute of limitations, or any other defense for that matter, to any future action by Transatlantic on this claim.C. Damages.
 
 
 40
 The default judgment entered by the District Court was in the amount of $51,753.86. To arrive at this number, the District Court simply accepted at face value Transatlantic's statement in its complaint that it "has sustained damages as nearly as can now be estimated in the amount of $45,976.83," and then added interest and costs to arrive at the $51,753.86 figure.
 
 
 41
 Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, "the court may conduct ... a hearing." We have held that, under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment." Fustok v. ContiCommodity Services, Inc., 873 F.2d 38, 40 (2d Cir.1989); see Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir.1993) ("not necessary for the district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record gained during four years involvement with the litigation ...' "); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir.1991) (where district judge was "inundated with affidavits, evidence, and oral presentations" a full evidentiary hearing was not necessary).
 
 
 42
 While the District Court may not have been obligated to hold an evidentiary hearing, it could not just accept Transatlantic's statement of the damages. This did not satisfy the court's obligation to ensure that the damages were appropriate. If the District Court concludes that this case does fall within admiralty jurisdiction, it should take the necessary steps to establish damages with reasonable certainty. Any action by the District Court in this regard would, of course, in no way undermine the validity of the default judgment on the issue of liability.
 
 Conclusion
 
 43
 While we in no way condone Ace's cavalier disregard of the earlier proceedings in this case, and we deny costs on appeal to emphasize the point, see F.R.App. P. 39, we are nonetheless obligated to ensure that the limited jurisdiction of the federal courts is exercised properly. This case is remanded to the District Court for further fact-finding on the issue of whether the case falls within the admiralty jurisdiction. If the District Court finds that admiralty jurisdiction is proper, the default judgment as to liability will stand, but the District Court must then determine the damages based on appropriate evidence. If the District Court concludes that this case does not fall within the admiralty jurisdiction of a federal court, it must, of course, dismiss the case.
 
 
 
 *
 Hon. Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation