**KULBERG FINANCES INC., Plaintiff,**

v.

**SPARK TRADING D.M.C.C., Cairo Three A for Trading, Cairo Three A for Trading S.A.E., and Cairo Three A Import & Export S.A.E., Defendants.**

No. 09 Civ. 00792.

United States District Court,
S.D. New York.

June 18, 2009.

Brown Gavalas & From LLP, by: Peter Skoufalos, Esq., New York, NY, for Plaintiffs.

Blank Rome LLP, by: Jeremy J.O. Harwood, Esq., New York, NY, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Spark Trading, Cairo Three A for Trading, Cairo Three A for Trading S.A.E., and Cairo Three A Import & Export S.A.E. (collectively "Spark" or "Defendants") have moved pursuant to Rules E(4)(f) and 12(b)(1) of the Federal Rules of Civil Procedure to vacate the maritime attachment obtained by plaintiff Kulberg Finances ("Kulberg" or "Plaintiff") for lack of subject matter jurisdiction. For the reasons set forth below, the existence of subject matter jurisdiction has been established, but the attachment is vacated for failure to state a valid maritime claim under English law.

The underlying dispute arises out of a contract for the sale of Ukranian feed barley by Kulberg to Spark. Under the terms of the contract, Kulberg was responsible for the delivery by cargo ship of the barley to Spark, who was then responsible for the timely discharge of the cargo. Kulberg alleges that Spark exceeded the contractual time for discharge, thereby incurring a demurrage[1] charge of

---

1. " 'Demurrage' is remuneration of the ship- owner for the detention of its vessel beyond

$232,452.56, for which Spark is liable to Kulberg.

## PRIOR PROCEEDINGS

On January 27, 2009, Kulberg filed its complaint in the Southern District of New York. On January 29, 2009, an Order of Attachment was signed in the amount of $337,924.50, which included the demurrage charge, interest, and legal costs. On May 29, 2009, Spark moved to vacate the attachment on the ground that the Court lacked subject matter jurisdiction over Kulberg's claims. The motion was marked fully briefed on June 8, 2009.

## THE FACTS

On August 30, 2008, the parties entered into Contract No. 532.080830 for the sale and delivery of 7,000 metric tons of Ukranian origin feed barley to the port of Tartous, Syria ("the Contract"). The Contract contains numerous provisions regarding the terms of the sale, including the characteristics of the grain to be purchased, guarantees of quality, and payment terms. *See* Exh. 1 to the Declaration of Robert Andrew Jardine–Brown ("Jardine–Brown Decl.") (Contract # 532.080830).

In addition to the terms and conditions of sale, the Contract contains several clauses relating to ocean transportation and the discharge of the cargo. "Discharge conditions" found in the Contract include the following provisions:

- Buyers guarantee a discharging rate of 1500 metric per [weather working day] of 24 consecutive hours, Fridays, Saturdays, Holidays excluded, even if used for vessel of 7,000 tons with 10% tolerance more or less for cargo intake.

- Time to start counting as from 8:00 hours next working day after valid Notice Of Readiness has been tendered during usual office hours, [whether in berth or not, whether in free pratique or not, whether customs cleared or not].

- Time from Thursday (or day preceding a Holiday 14:00 hours till Sunday (or next working day) 08:00 hours not to count as lay-time, even if used.

"Special conditions" for the voyage include the following provisions:

- Demurrage-/dispatch-rate as per Charter Party, free dispatch. Seller to present copy of charter party/valid fixture recap to Buyers upon request.

- Buyers' agent at discharge port.

- Vessel to be single-decker, bulk-carrier, suitable for grab-discharge, classified by Lloyd's A1 or equivalent, have valid ISM certificate and be fully covered by respectable P & I club.

- Max. Age of the vessel is 30 years.

- Sellers to ensure that Ship-owners have no right nor any reason to exercise any lien over the cargo in respect of freight, dead-freight, demurrage or damages for detention and Sellers shall indemnify and hold harmless the Buyers in respect of any loss, damage or delay caused to the Buyers by the Ship-owners exercising any such lien in this regard.

*Id.* The Contract therefore specified that Defendants were responsible for the timely discharge of the barley upon the vessel's arrival to Tartous as well as any demurrage charges resulting from their failure to discharge the cargo within the allotted lay-time.

the number of days allowed by the charter-party." *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384, 386 n. 2 (2d Cir.2000) (citing Black's Law Dictionary 432 (6th ed. 1990)).

In addition, the Contract incorporated the form contract of the Grain and Feed Trade Association ("GAFTA") which provides for arbitration before GAFTA of disputes arising under the Contract:

> Conditions: All other terms, rules and conditions, not conflicting with the contents of this contract are as per GAFTA Nr. 100.
>
> • Arbitration, in London, as per GAFTA Nr. 125.

*Id.* GAFTA Nr. 100 provides that the contract "shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England." Exh. 1 to the Declaration of Vladyslav Markelov ("Markelov Decl.") (Gafta No. 100). The charter party agreement between Kulberg and the ship owners similarly directs that English law govern any disputes. Jardine–Brown Decl. Exh. 2 (Charter Party dated 4/9/2008) ("ARBITRATION/GENERAL AVERAGE IN LONDON AS PER ENGLISH LAW."). Neither party challenges the application of English law as the substantive law of the Contract.

Based on the cargo quantity of 6,926.8 metric tons, Defendants were permitted a laytime of 4 days, 15 hours, and 50 minutes to offload the purchased barley. According to Plaintiff, Defendants exceeded the allotted laytime by 31 days, 18 hours, and 55 minutes.

On November 24, 2008, Plaintiff demanded that Defendants pay all sums due and owing for demurrage at the port of discharge. In response to Defendants' refusal to pay, Plaintiff initiated arbitration proceedings, pursuant to the Contract's arbitration clause, before GAFTA in London seeking payment of the demurrage costs. An arbitration decision is currently pending.

Plaintiff subsequently commenced the present action seeking an order of maritime attachment pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure as a means of securing Spark's assets in anticipation of a favorable arbitration decision. Defendants move to vacate the attachment on the grounds that this Court lacks subject matter jurisdiction over Plaintiff's claims.

## DISCUSSION

### I. MARITIME ATTACHMENTS AND ADMIRALTY JURISDICTION OF THE COURTS

#### A. Background

■ "The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty ... has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. The Disintegrating Co.*, 85 U.S. 272, 303, 18 Wall. 272, 21 L.Ed. 841 (1873). "Maritime attachments arose because it is frequently, but not always, more difficult to find property of parties to a maritime dispute than of parties to a traditional civil action." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 443 (2d Cir.2006). Thus, the traditional rule of maritime attachments has been to permit attachments wherever the property of the defendant may be found, and not require a plaintiff "to scour the globe" to find a proper forum where defendant possesses sufficient property to satisfy a judgment. *Id.*

■ The present rules for obtaining a maritime attachment are found in the Federal Rules of Civil Procedure Supplemental Rule B, which was promulgated under the Rules Enabling Act, 28 U.S.C. § 2071. To obtain an attachment, plaintiff must file a verified complaint seeking attachment

and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. Fed.R.Civ.P. Supp. R. B(1). Plaintiff must also demonstrate that it has a valid prima facie admiralty claim against the defendant. *Aqua Stoli*, 460 F.3d at 445. Thereafter, Rule E(4)(f) provides that any person claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed.R.Civ.P. Supp. R. E(4)(f). During the vacateur hearing, plaintiff bears the burden of establishing that the attachment should not be vacated. *Aqua Stoli*, 460 F.3d at 445. At the hearing the defendant "can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed.R.Civ.P. Supp. R. E(4)(f), Advisory Committee's Note.

## B. The Dispute Falls Within the Court's Admiralty *Jurisdiction*

### 1. United States Law Determines the Court's Admiralty Jurisdiction

The threshold issue to be addressed is the law to be applied in determining whether subject matter jurisdiction exists over Plaintiff's claim. Defendants assert that the determination of the Court's admiralty jurisdiction turns on whether a valid maritime claim exists under the applicable substantive law. Defendants argue that because English law governs the Contract, and English law does not recognize Plaintiff's claim as "maritime," this Court lacks subject matter jurisdiction over the complaint and the attachment must be vacated.

 "Neither Rule B nor any other of the supplemental Rules create a valid prima facie admiralty claim. Rather, the Supplemental Rules fashion procedures by which a valid maritime claim may form the basis for a writ of maritime attachment." *Sonito Shipping Co. Ltd. v. Sun United Mar. Ltd.*, 478 F.Supp.2d 532, 536 (S.D.N.Y.2007). Because Rule B constitutes a procedural remedy for maritime claims, United States maritime law, and not the applicable substantive law of England, governs the determination of this Court's subject matter jurisdiction. *See Tennessee Coal, Iron & R.R. Co. v. George*, 233 U.S. 354, 360, 34 S.Ct. 587, 58 L.Ed. 997 (1914) ("[J]urisdiction is to be determined by the law of the court's creation."); *Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40, 50 (2d Cir.2007) ("[T]he law of the forum—federal maritime law—governs procedural law").

*Wall Street Traders, Inc. v. Sociedad Espanola de Construccion Naval*, 245 F.Supp. 344 (S.D.N.Y.1964) is particularly informative. Much as Defendants do here, the defendant in *Wall Street* argued that the court lacked admiralty jurisdiction because Spanish law, the governing law of the contract, did not consider "a suit on such a contract [ ] a maritime action." *Id.* at 350. Finding the argument to be "without merit," the court observed:

> If the law of the place of the transaction is applied, the jurisdiction of a federal admiralty court would be dependent upon the peculiarities of particular foreign law and jurisdiction would vary from nation to nation. Such an interpretation of this court's admiralty jurisdiction would be contrary to the principal purpose behind the creation of federal admiralty jurisdiction—the establishment of a 'general system of maritime law with uniform operation.'

*Id.* (citing *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 43, 55 S.Ct. 31, 79 L.Ed. 176 (1934)).

The cases cited by Spark on pages 9–11 of its Memorandum of Law in Support of Motion to Vacate Order of Maritime Attachment ("Mot. to Vacate") are not to the contrary. While the courts in most of the cases utilized the substantive law of the contract, the question presented was not one of subject matter jurisdiction, but rather the existence of a valid maritime claim for purposes of a Rule B attachment. *See, e.g., Sonito Shipping,* 478 F.Supp.2d at 536–37 ("The case at bar turns on whether . . . the complaint pleads a 'valid prima facie admiralty claim.' "); *Ice Flake Mar. Ltd. v. Westcoast AS,* No. 07 Civ. 2002(PKC), 2007 WL 2979471, at *1, 2007 U.S. Dist. LEXIS 75677, at *2 (S.D.N.Y. Oct. 11, 2007) ("[Defendant] challenges the existence of a valid prima facie maritime claim.").

In *Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd,* No. 07 Civ. 10640(PKL), 2008 WL 111003, 2008 U.S. Dist. LEXIS 2438 (S.D.N.Y. Jan. 10, 2008), the Honorable Peter K. Leisure considered the question of the relevant law to be applied in determining the existence of subject matter jurisdiction. Defendant Trans Pacific moved to vacate a Rule B attachment on the ground that the court lacked subject matter jurisdiction over plaintiff Nais's claim for legal defense costs. In vacating the attachment, Judge Leisure declined to decide whether American or English law should apply, concluding instead that Nais failed to state a maritime claim under the law of either jurisdiction. *Id.* at *7–9.

None of the cases cited by Spark supports the proposition that the substantive law of the Contract serves to define the existence of American courts' admiralty jurisdiction. Consequently, we apply American maritime law in determining the existence of admiralty jurisdiction under the present circumstances.

### 2. Kulberg's Claim for Demurrage Is A Severable Maritime Claim under U.S. Law.

The admiralty jurisdiction of the federal courts is grounded in Article III of the Constitution. *See* U.S. Const. art. III, § 2 (providing that the federal judicial power shall extend to "all Cases of admiralty and maritime Jurisdiction"); *see also* 28 U.S.C. § 1333(1) (granting federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction"). "Federal courts may exercise their maritime jurisdiction granted by section 1333 of title 28 of the United States code if an action is based on a maritime contract." *F.H. Bertling Holding KG v. Ranhill Eng'rs & Constr. SDN, BHD.,* 591 F.Supp.2d 377, 381–82 (S.D.N.Y.2008). However, as the Supreme Court has recognized, "the boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Norfolk S. Ry. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) ("*Kirby*") (quoting *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961)).

■ In an action to enforce a contract, the existence of admiralty jurisdiction is determined by "the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Id.* at 24, 125 S.Ct. 385 (quotation omitted);[2] *see*

---

**2.** Prior to *Kirby,* the Second Circuit required a "threshold inquiry" into whether the subject matter of the dispute is so attenuated from the business of maritime commerce that maritime jurisdiction should not be found to exist. *See*

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 200 (2d Cir.1992). The Second Circuit has since expressed uncertainty as to whether this "threshold inquiry" requirement survives Kirby. *See Folksamerica*

also *Folksamerica Reinsurance Co. v. Clean Water of NY, Inc.*, 413 F.3d 307, 312 (2d Cir.2005) (noting that "the contract's subject matter must be [the courts'] focal point."). As the Second Circuit has stated, "the proper inquiry is 'whether the principal objective of a contract is maritime commerce.'" *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir.2008) (quoting *Folksamerica*, 413 F.3d at 315).

■ "The general rule for exercising admiralty jurisdiction in a contract case is that 'jurisdiction arises only when the subject-matter of the contract is "purely" or "wholly" maritime in nature.'" *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir.2000) (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir.1997)). However, courts have held that admiralty jurisdiction may be exercised over "mixed" contracts containing both maritime and non-maritime elements if the contract falls within one of two exceptions to the general rule. *Folksamerica*, 413 F.3d at 314 (citing *Transatlantic Marine*, 109 F.3d at 109). Under the first exception, a federal court can exercise admiralty jurisdiction over a "mixed" contract if the non-maritime elements of a contract are "merely incidental" to the maritime portions. *Transatlantic Marine*, 109 F.3d at 109; *see also Sirius Ins. Co. (UK) v. Collins*, 16 F.3d 34, 37 (2d Cir.1994). Under the second exception, which Plaintiff argues applies to the instant case, a federal court may exercise admiralty jurisdiction over claims arising from a "breach of maritime obligations that are severable from the non-maritime obligations of the contract."

*Reins. Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 313 (2d Cir.2005). As discussed *infra*, the instant dispute stems from a classic maritime claim for demurrage and

*Folksamerica*, 413 F.3d at 314 (quoting *Hartford Fire*, 230 F.3d at 555).

■ It is well established that claims for demurrage are classic maritime claims that fall within the Court's admiralty jurisdiction. *See, e.g., Stemcor UK Ltd. v. Sesa Int'l Ltd.*, 09 Civ. 1155(LBS), 2009 WL 1424008, at *2, 2009 U.S. Dist. LEXIS 42855, at *7 (S.D.N.Y. May 18, 2009); *Crossbow Cement SA v. Mohamed Ali Aleh Al Hashedi & Bros.*, 08 Civ. 5074, 2008 WL 5101180, at *5, 2008 U.S. Dist. LEXIS 98319, at *14 (S.D.N.Y. Dec. 4, 2009); *Centramet Trading S.A. v. Egyptian Am. Steel Rolling Co.*, No. 07 Civ. 6379(RMB), 2007 WL 5731922, at *1, 2007 U.S. Dist. LEXIS 97940, at *3 (S.D.N.Y. Sept. 28, 2007).

■ Plaintiff's claim, as presented both in its request for arbitration to GAFTA and its verified complaint initiating the present action before this Court, is based solely on Defendants' alleged violation of the provisions of the contract concerning the discharge of the vessel's cargo. As previously described, those provisions establish time limits for offloading the cargo; assign to the buyer, Spark, the responsibility for any demurrage charges incurred; and establish a rate for demurrage charges by reference to the charter party. Rather than alleging, as Spark asserts, the "breach of a non-maritime contract to purchase barley," Mot. to Vacate at 19, Plaintiff sets forth a classic maritime claim for demurrage severable from the "non-maritime" portions of the contract. *See, e.g., Noble Res. Pte. Ltd. v. Metinvest Holding Ltd.*, 08 Civ. 11194(PGG), 2009 WL 977098, at *7, 2009 U.S. Dist. LEXIS 30720, at *25 (S.D.N.Y. Apr. 10, 2009) (observing that it is "well-settled" that demurrage claims are

implicates concerns underlying admiralty and maritime jurisdiction. As a result, the claim easily survives the threshold inquiry.

maritime in nature and "severable from sale and purchase agreements"); *Crossbow Cement,* 2008 WL 5101180 at *7 ("Plaintiff's claim arises solely from the demurrage clause, which is severable from the rest of the Sales Contract and Amendment."); *Centramet,* 2007 WL 5731922 at *2–3; Transcript of Oral Argument at 24, *Kulberg Fins., Inc. v. Ipek Yem Ve Gida Sanay: Ticaset A.S.,* 08 Civ. 10592(LAK) (S.D.N.Y. Apr. 22, 2009) (acknowledging the existence of "a fair amount of persuasive authority to the effect that a claim for demurrage in a payable under a mixed contract for the sale of goods is a severable Maritime claim where the contract provides that the buyers is to reimburse the seller for demurrage"); Transcript of Oral Argument at 19, *Noble Res. S.A. v. Sarl Quest Import,* 08 Civ. 357 (S.D.N.Y. Aug. 12, 2008).

*Aston Agro–Industrial AG v. Star Grain Ltd.,* No. 06 Civ. 2805(GBD), 2006 WL 3755156 (S.D.N.Y. Dec. 20, 2006), cited by Defendants, is distinguishable on its facts from the case at bar. In *Aston,* the Honorable George B. Daniels found that the court lacked subject matter jurisdiction over demurrage claims relating to a contract for the sale of wheat. *Id.* at *4–5. Observing that the "so-called 'demurrage clauses' " in dispute failed to set forth the parties' obligation to compensate each other for demurrage owed to the vessel owner, Judge Daniels concluded that resolution of the dispute required nothing more than ordinary contract interpretation to determine which party bore the risk of the loss of goods. *Id.* at *4. Consequently, the "demurrage clause" did not constitute a severable maritime provision falling within the court's admiralty jurisdiction. In contrast, the present Contract's provisions concerning demurrage charges, as described *supra,* assign to the Buyer the obligation for demurrage charges and specify other maritime-related conditions

and obligations that touch upon concerns relating to the "protection of maritime commerce." *Exxon Corp. v. Central Gulf Lines, Inc.,* 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991).

Because Plaintiff's claim for demurrage constitutes a maritime claim severable from the "non-maritime" portions of the sales contract, it falls within the admiralty jurisdiction of this Court. Subject matter jurisdiction over Plaintiff's claim has therefore been established.

## II. KULBERG FAILS TO ESTABLISH A PRIMA FACIE MARITIME CLAIM UNDER ENGLISH LAW

On a motion under Rule E(4)(f) to vacate an attachment, the plaintiff bears the burden of establishing the existence of a valid prima facie admiralty claim against the defendant. *See Aqua Stoli,* 460 F.3d at 445; *Dolco Inv., Ltd. v. Moonriver Dev., Ltd.,* 486 F.Supp.2d 261, 266–67 (S.D.N.Y.2007) (noting that the majority of courts in the district have applied the "prima facie standard when considering the adequacy of the claim in a maritime vacatur motion"); *Chiquita Int'l Ltd. v. MV Bosse,* 518 F.Supp.2d 589, 597 (S.D.N.Y.2007); *Eitzen Sealift A/S v. Cementos Andinos Dominicanos SA,* No. 05 Civ. 4550(DC), 2005 WL 2218025, at *2 (S.D.N.Y. Sept. 9, 2005). As numerous courts have recognized, the existence of a valid prima facie admiralty claim turns on the applicable substantive law—here, the law of the contract. *See T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.,* 415 F.Supp.2d 310, 314 (S.D.N.Y.2006) ("[T]he law of the contract applies to the question of whether a claim has accrued."), *overruled on other grounds by Aqua Stoli,* 460 F.3d at 446; *Penguin Maritime Ltd. v. Lee & Muirhead Ltd.,* 588 F.Supp.2d 522, 526–27 (S.D.N.Y.2008) (applying Indian

law in considering the existence of a valid prima facie admiralty claim); *Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.,* No. 07 Civ. 8325(JGK), 2008 WL 3172998, at *2, 2007 U.S. Dist. LEXIS 58453, at *5–6 (S.D.N.Y. July 31, 2008) (applying English law to determine the existence of a valid maritime claim where the charter party specified that English law would govern); *Sonito Shipping,* 478 F.Supp.2d at 536–37 (same).

 The parties do not dispute that English law provides the substantive law governing the terms of the contract. The affidavit of Robert Jardine–Brown, submitted in support of Spark's Motion to Vacate, establishes that under English law Plaintiff's claim "is not a claim in respect of which the admiralty jurisdiction of the English High Court could be invoked." Jardine–Brown Decl. ¶ 13. Plaintiff has not presented any evidence, either through counsel during oral argument or the Markelov Declaration accompanying Spark's opposition, that refutes this characterization of English law. Moreover, the parties' agreement that disputes arising under the Contract were to be arbitrated by GAFTA, and not the London Maritime Arbitration Association ("LMAA") as is customary for true maritime claims, is consistent with an understanding that English law does not view the present claim as "maritime." *See, e.g., Aston,* 2006 WL 3755156 at *13 n. 5 (citing fact that parties' contract specified arbitration before GAFTA rather than a maritime arbitration body in concluding no maritime claim existed); *cf. Stemcor,* 2009 WL 1424008 at *2, 2009 U.S. Dist. LEXIS 42855 at *7 (finding agreement by parties to arbitrate before a maritime tribunal indicative of parties' view that contract pertained to maritime commerce); *Crossbow Cement,* 2008 WL 5101180, at *6 (noting contract called for dispute resolution by LMAA

rather than GAFTA in concluding claim in question was maritime claim).

Kulberg has failed to meet its burden of establishing the existence of a valid prima facie admiralty claim under English law. Consequently, the Rule B attachment must be vacated.

*CONCLUSION*

For the reasons set forth above, Defendants' motion to vacate the order of maritime attachment is granted. Plaintiff is directed to immediately release Defendants' attached funds and is barred from seeking further attachment of Defendants' funds pursuant to the vacated attachment.

It is so ordered.